507 So.2d 809 (1987)
Emerza S. TOUPS and Richard S. Toups, Sr., Individually and as Parents, Administrators and Natural Tutors of Their Minor Son, Shawn M. Toups
v.
SEARS, ROEBUCK AND COMPANY, INC., et al.
No. 86-C-2493.
Supreme Court of Louisiana.
May 18, 1987.
Rehearing Denied June 18, 1987.
*810 John McCann, James McCann, McCann & McCann, Salvador Cusimano, Charles Verderame, Thomas L. Giraud, Giraud, Cusimano & Verderame, New Orleans, for applicant.
Lawrence Ernst, Christovich & Kearney, John Combe, Jr., Madeleine Fischer, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for respondent.
WATSON, Justice.
Plaintiffs[1] seek damages for second and third degree burns covering about fifty percent of a three year old boy's body. The injuries resulted from a flash fire emanating from a Sears' hot water heater.[2] Plaintiffs' strict product liability action rests on two premises: failure to warn of the water heater's suction effect on flammable vapors; and/or failure to adopt an *811 alternative design. A jury determined that the hot water heater was not defective but did not make specific findings about adequate warning or the feasibility of alternative designs. The court of appeal affirmed dismissal of plaintiffs' suit,[3] and a writ was granted to consider the judgment.[4]

FACTS
The accident occurred on August 17, 1977, at 1728 Frenchmen Street, New Orleans, Louisiana. Mrs. Marion Spatafora, the grandmother of the injured child, Shawn M. Toups, owned a raised shotgun double house with an eight by eight foot shed or lean-to in the rear. Shawn's grandmother, mother, half sister, Denise Henderson, and a twelve year old brother, Richard Toups, Jr., lived together in onehalf of the double house.
The shelter which was attached to the rear of the house contained a hot water heater. The water heater was less than a year old and had been purchased by Mrs. Spatafora at Sears in October of 1976. At the time it was sold, Sears anticipated that it could be installed in a shed adjacent to a residence.
The house was approximately three feet above ground. The back shed had a slanted roof: one side was open; the other two were partially enclosed with louvered shutters, many of which had missing slats. The area was well ventilated. The hot water heater was installed two inches off the concrete floor in a corner next to the rear wall of the house. Being subject to weather, wind, and dirt, it was dented, scratched and dirty. An old lawnmower was in another corner of the shed, about three feet from the hot water heater. The mower's handle was burned in the fire, and its plastic gasoline storage tank destroyed. A gasoline can was in the lean-to, as well as an old armoire and a small wooden dresser. The gasoline can, which was used to fill the lawnmower, was scorched on one side by the fire. It was on the far side of the lawn mower about six feet away from the hot water heater. Usually stored on a high shelf, the gasoline can was on the floor of the shed after the accident.
After an early dinner, Shawn Toups went outside to fetch his tricycle from the back shed. When the hot water was turned on inside the house for the dinner dishes, the burner under the hot water heater ignited, it sucked in gasoline vapors, and an explosive fire occurred. Florence Condon, a guest for dinner, said that when the hot water was turned on they heard a "poofing" type of sound.[5] Shawn was severely burned. No one witnessed the accident. Two neighbors, Mr. Lenoir and Mr. Lombas, put out most of the flames before the fire department arrived.
Richard Toups, Jr. was not at home when the accident occurred. After cutting the grass that morning, he had left with a friend. The lawnmower, which had to be carried in and out of the shed, had been replaced at the opposite end of the shed from the hot water heater. Mrs. Toups had never used the lawnmower, and her only contact with the gasoline can was to take her older son to the service station to purchase gasoline. She knew there was an open flame inside the heater and gasoline is dangerous. She was not aware that it is gasoline vapors rather than the gasoline itself which presents the greatest danger. To her knowledge, the gas can and the lawnmower were not hazardous unless they were adjacent to the hot water heater.
Steven Lenoir lived in the other side of the double house. While watching television, he heard a small explosive sound, similar to that of a muffled fire cracker. Later, learning there was a fire next door, he jumped the fence, and found Mr. Lombas with a hose in his hand. Glancing around, he saw a charred lawnmower and a five gallon gas can on the floor.
Dr. Frank Charles DiVincenti, medical director of the burn unit at Charity, testified that Shawn Toups had a forty to fifty percent burn involving his face, arms, and legs. The leg burns went completely *812 around the extremities. The feet of the patient were badly burned and apparently had received an intense amount of heat. The doctor did not recall the soles of the boy's feet or his palms being burned.
Shawn's palms and chest were completely free of burn damage.[6] The soles of his feet were also undamaged.[7] Shawn told his sister Denise and the head nurse in the Charity Hospital burn unit that the hot water heater burned him.
The fire was reported at 7:13 in the evening. Captain Milton E. Dauterive of the New Orleans Fire Department said the fire occurred as the result of fuel accidentally spilled or released from a gasoline lawnmower. According to his testimony, the lawnmower was approximately three feet from the water heater, being closer to the water heater than the gasoline can which was on the far side of the mower. The gasoline can was possibly six feet from the water heater. The lawnmower and gas can were scorched and the only thing actually burning when the firemen arrived were the weather boards on the back of the house. The gasoline can was sitting upright; the base of the lawnmower was burned; the tank of the lawnmower was completely destroyed; and there was evidence that gasoline had spilled and run under the water heater where the vapors ignited to cause the flash fire. In Captain Dauterive's opinion, the fire was caused by improper storage of gasoline in the same area as the water heater.
According to the investigating police officer, Patrolman Randy Leitz, the gas can in the shed had a cap on it with a hole, but no nozzle.
Leonard C. Mandell is a consulting engineer and forensic scientist who specializes in fire safety. Highly qualified by education and experience, Mandell testified as an expert in the fields of mechanical engineering, forensic science and safety engineering. These specialities include thermal fire combustion, heating, and ventilation.
According to Mandell, any evaporation from the gas can would have been insufficient to cause the fire and the can's burn markings were inconsistent with it being the source of the fire. In his expert opinion, the gasoline can was not a factor in the fire. Since the air intake to the heater is at floor level, air is sucked up into the heater when the main burner comes on. Gasoline vapor, which is invisible, is four times heavier than air and falls very quickly to the ground. The plastic temperature regulating knob on the water heater had been exposed to a flash flame for a few seconds. In Mandell's opinion, the ignition source came from the base of the hot water heater. Gasoline vapor was sucked into the bottom opening of the hot water heater and caused the injury. The gasoline involved was a small amount, perhaps as little as eight fluid ounces.
Mandell found the hot water heater to be an unreasonably dangerous product because it did not warn users to keep flammable liquids like gasoline, which is commonly used in home maintenance appliances, away from the heater. Gas tanks have cracks and leaks in their hoses. Since flammable vapors from gasoline are heavier than air, any leak from a gasoline appliance could be sucked into the flame of a hot water heater and cause a flash combustion. Even a drop converts itself at a hundred times its volume into a flammable vapor. Users should be warned of that possibility. Being extremely flammable, gasoline in a vapor state burns explosively. The heater was also described as unreasonably dangerous because neither it nor its air intake was elevated fifteen to eighteen inches from the ground.
If the bottom of the heater or its air intake had been at an eighteen inch elevation, the gasoline vapors probably would not have reached an explosive concentration, because the vapors hug the ground. At the time this hot water heater was manufactured in 1976, it would have been feasible to place the air intake hose eighteen inches above the ground. The difference *813 in price would have been insignificant and the bottom could have been screened or filtered against dust and dirt. The only warning affixed to the hot water heater said: "Minimum clearance from combustible construction two inches from side and two inches from back."[8] In Mandell's opinion, this was not a warning but a "booby trap"[9] because most people are unaware how dangerous gasoline can be.
Proffer number four by plaintiffs illustrates the present Sears' water heater which has large warning letters underlined in red saying: "... DO NOT STORE OR USE GASOLINE OR OTHER FLAMMABLE VAPORS AND LIQUIDS IN THE VICINITY OF THIS OR ANY OTHER APPLIANCE...."[10] This was approximately the warning that expert Mandell said should have been permanently affixed to this heater in a conspicuous color.
In Mandell's expert opinion, there was some leakage of fuel from the gasoline powered mower and the vapor found its way into the Sears' hot water heater where it flashed into flame and burned Shawn Toups. The heater should have been at least ten to fifteen feet away from all fuel burning appliances.
In Mandell's opinion, gasoline was not being poured from the gasoline can into the lawnmower's tank at the time of the fire, because the fire damage would have been much more severe and more evenly developed on the lawnmower in that case.[11] The combination of wind, temperature, location of the hot water heater, leaking gasoline from the lawn mower, and the drawing of hot water inside the house created a unique scenario which caused this fire. The lawnmower was approximately ten years old and gasoline leaks from a gasoline powered lawnmower are "endemic".[12]
According to Mandell, there had to be gasoline in the tank of the mower because of the fire markings, the burnt out gasoline hose, and the fact that the plastic gas tank burned. The plastic nozzle of the gas can melted, indicating that it was on the can at the time of the fire.
This expert distinguished between the common knowledge that gasoline is flammable and the properties of gasoline that make it extremely and unreasonably dangerous, to-wit: the fumes and vapors which it emits. Flammable vapors are heavier than air and sink to the floor. When the main burner of a hot water heater turns on, it sucks up air from floor level. If there are flammable vapors at floor level, you will have a flash fire like the one that occurred here.
In Mandell's opinion, it was scientifically absurd to speculate that the child had tried to pour gasoline and thereby caused the fire. In his long experience with fires, Mandell had never seen an individual who was holding, pouring, or playing with a flammable liquid injured like Shawn Toups. Shawn's chest, hands and the soles of his feet were free of burns. The soles of Shawn Toups' feet would have burned if gasoline had been burning on the floor.
Mandell described the sound made when vapors and air explode or ignite as a "violent like woosh."[13] Because the least damaged tire on the lawnmower was the right front tire where the gasoline tank was located, Mandell thought it was impossible for the fire to have occurred while gasoline was being poured into the tank of the lawnmower. The lack of fire damage to the base of the hot water heater indicated the absence of a large flame from burning gasoline, and showed that the fire must have been caused by flammable vapor.
Frank N. Fowler, who died prior to trial, testified in deposition that he had a safety and engineering firm with special training and experience in the fields of safety and human factors engineering. He concluded that the lawnmower was the source of the *814 fuel which caused the fire because the water heater itself was not burned. The burn patterns indicated that fumes from the gas tank of the lawnmower caused a flash fire from the water heater back to the lawnmower.[14] The burn pattern on the gas can showed no leakage and he determined that it could not have been the source of the fire. If the gas can itself had been involved, it would have ruptured and it only had some superficial scorching.
Fowler noted the absence of any warning regarding the storage of flammable liquids around the heater or in the same enclosure. According to his testimony, a 1978 Code addendum requires warnings to be posted on a water heater, but the addendum was not in effect when this water heater was manufactured.
The Sears owners' manual states on the first page: "Do not store or use gasoline or other flammable vapors and liquids in the vicinity of this or any other appliance." This water heater's manual lacked a warning which Sears added to the front page of subsequent owners' manuals: "FLAMMABLE VAPORS MAY BE DRAWN BY AIR CURRENTS FROM OTHER AREAS OF THE STRUCTURE TO THIS APPLIANCE."
The trial court precluded plaintiffs from introducing evidence of standards, publications, or modifications subsequent to the date of the accident. Publications by the National Safety Council and the Consumer Products Safety Commission were also ruled inadmissible. The Consumer Products Safety Commission was founded by Congress to benefit the public and that information was available to Sears and other hot water manufacturers and distributors.
Plaintiffs' proffer number one is the "Neiss News", a U.S. Consumer Products Safety Commission publication for August and September of 1974 which considered injuries associated with water heaters during 1973. The U.S. Consumer Products Safety Commission estimated that there were 3,800 injuries associated with water heaters during 1973. Seventy-three of those cases, a random sample, were investigated in-depth. Forty involved ignition of flammable vapors by water heater flames, thirty-four of the forty being gas water heaters. The report notes that several victims were unaware that flammable liquids are dangerous in proximity to hot water heaters. The trial court excluded the publication as hearsay.
Ernest Wenzel, Vice-President of Product Development and Research for State Industries, Inc., testified that he was responsible for the design of this water heater. Despite his industrial affiliation and some lack of academic qualifications, he testified as an expert in the field of designing and manufacturing water heaters. This heater met the 1971 ANSI standards and was certified by the American Gas Association, which is a group representing industry that has minimum standards. According to Wenzel's testimony, all of the natural gas residential hot water heaters manufactured in 1976 had their air intakes located within two or three inches of the ground. In Wenzel's opinion, the average consumer is aware that gasoline vapors are flammable. However, he admitted that the average consumer, from experience with cigarette lighters and gas tank vapors, would believe that such vapors rise.
Wenzel's ANSI Committee received a 1975 Consumer Products Safety Commission report on water heaters in 1976 indicating that there were injuries occurring from water heater ignited fires. He did not recall whether that report was made available before October of 1976. He admitted that the study recommended a warning concerning possible injury from gasoline vapors or flammable vapors. According to Wenzel: "[t]he recommendation was that a warning be placed on water heaters with respect to flammable liquids and vapors."[15] A warning could have been placed on the water heater at a negligible cost if it had been considered necessary. Wenzel did not consider such a warning necessary. Wenzel had not anticipated *815 that the two inch warning might be construed as denoting the zone of danger around the water heater.
Donald E. Wandling, a consulting engineer, testified as an expert in the field of mechanical and electrical engineering, including the identification of fires, combustion and ventilation. In his opinion, the most probable cause of the fire was pouring of gasoline from the can, into the mower, although not necessarily at the time the fire ignited. Wandling did not think a warning on the water heater would have prevented the accident. In his opinion, the water heater was a typical design of the time and was not defective. Wandling admitted that he would be reluctant to store a lawnmower "in close relationship with the water heater just because it had an open flame."[16] Wandling also admitted that the ordinary consumer would not know about "the drawing action" or suction effect of the heater.[17]
The pattern of the fire damage to the lawnmower established that it was not a primary source of the fire. One wheel was almost completely unburned, the wheel away from the hot water heater.
The jury was instructed at length about negligence and assumption of the risk and was charged: "A defense to liability in a case of this type may be assumption of the risk or contributory negligence."[18]
The jury was also charged: "As a general rule, a seller or vendor of a product is not presumed to know of any latent defects in the product he sells."[19]
In pertinent part, the interrogatories submitted to the jury only asked if the water heater was defective. No interrogatories were submitted to the jury on the issues of failure to warn or failure to adopt an alternative design.
Plaintiffs objected to the trial court's failure to submit a jury interrogatory on failure to warn and also objected to the jury being charged that a design is not defective if reasonable care is taken in its adoption.

LAW
"In order to recover from a manufacturer, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. The plaintiff need not prove negligence by the maker in its manufacture or processing, since the manufacturer may be liable even though it exercised all possible care in the preparation and sale of its product. Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985); Hebert v. Brazzel, 403 So.2d 1242 (La. 1981); DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981); Hunt v. City Stores, 387 So.2d 585 (La. 1980); Chappuis v. Sears, Roebuck & Co., 358 So.2d 926 (La.1978); Weber v. Fidelity & Casualty Ins. Co. of New York, 259 La. 599, 250 So.2d 754 (1971)."[20]
"Although a product is not unreasonably dangerous per se or flawed by a construction defect, it may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Winterrowd v. The Travelers Indemnity Co., 462 So.2d 639 (La.1985); Hebert v. Brazzel, 403 So.2d 1242 (La.1981); Chappuis v. Sears, Roebuck & Co., 358 So.2d 926 (La.1978); cf. Rey v. Cuccia, 298 So.2d 840 (La.1974)."[21]
Even if the utility of a product outweighs its danger, if the product could feasibly be designed to be less hazardous, *816 the manufacturer is liable. Halphen, supra.
A manufacturer is presumed to know of the defects in its product and is therefore required to protect persons against foreseeable risks of injury by adequate warnings. Hunt v. City Stores, Inc., 387 So.2d 585 (La., 1980).
LSA-R.S. 13:3713 allows evidence of reports by United States government commissions to be received in evidence. Although the statute apparently limits that evidence to reports published by the government printing office in Washington, D.C., the legislative intent was not that narrow. Sinagra v. Illinois Cent. R. Co., 220 La. 205, 56 So.2d 233 (1951). A government report of a general investigation, because of its trustworthiness, should be admitted into evidence in the interests of judicial economy and fairness. See Burley v. Louisiana Power & Light Co., 319 So.2d 334 (La., 1975). Proposed Louisiana Code of Evidence, Art. 902, Subsection (5) states:
"Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:
* * * * * *
"(5) Official publications. Books, pamphlets, or other publications purporting to be issued by public authority. * *"
This article merely clarifies prior Louisiana law.
Almost identical to this case is Hohlenkamp v. Rheem Mfg. Co., 134 Ariz. 208, 655 P.2d 32 (Ariz.App. 1982). Although the Arizona court ruled that evidence of subsequent warnings about storage of flammable materials near water heaters was properly excluded, the Arizona court remanded for trial on the issue of strict liability for a design defect, noting the common practice of using storage rooms containing water heaters for storing other things, including combustibles, and the hidden nature of the pilot light on a water heater. See also Hyman v. Gordon, 33 Cal.App.3d 769, 111 Cal.Rptr. 262 (1974).
Harris v. Northwest Natural Gas Co., 284 Or. 571, 588 P.2d 18 (1978) held that failure to warn that the pilot lights of a furnace or hot water heater could ignite gasoline vapors stated a cause of action in negligence.
In general, remedial measures taken after an incident of negligent conduct are not admissible in evidence because such evidence would discourage people from taking steps to prevent future harm. See Givens v. DeSoto Bldg. Co., 156 La. 377, 100 So. 534 (1924); Galloway v. Employer's Mutual of Wausau, 286 So.2d 676 (La.App. 4 Cir.1973), writ den. 290 So.2d 333 (1974); and Currier v. Saenger Theaters Corporation, 10 So.2d 526 (La.App. 1 Cir.1942). Because of this exclusionary rule, the trial court here did not allow evidence of subsequent warnings added to Sears' water heaters and users' manuals.
Three Louisiana courts have excluded post-accident evidence that a product was defective. Smith v. Formica Corp., 439 So.2d 1194 (La.App. 1 Cir.1983); Landry v. Adam, 282 So.2d 590 (La.App. 4 Cir.1973); and Cook v. McDonough Power Equipment, Inc., 720 F.2d 829 (5 Cir., 1983). However, on the issue of failure to warn, such evidence has been admitted. Fontenot v. F. Hollier & Sons, 478 So.2d 1379 (La.App. 3 Cir.1985), writ granted 481 So.2d 1326 (La., 1986), affirmed as to liability in LaFleur v. John Deere Co., 491 So.2d 624 (La., 1986).
The policy considerations which exclude evidence of remedial measures in negligence cases are not applicable where strict liability is involved. See Unterburger v. Snow Company, Inc., 630 F.2d 599 (8 Cir., 1980); Farner v. Paccar, Inc., 562 F.2d 518 (8 Cir., 1977); Robbins v. Farmers Union Grain Terminal Ass'n, 552 F.2d 788 (8 Cir., 1977); and Ault v. International Harvester Company, 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1975).[22] In a strict product liability case, evidence of such remedial measures should be allowed insofar as they are relevant in *817 establishing what the manufacturer knew or should have known at the time of the injury. See the discussion under Art. 407 of the Proposed Louisiana Code of Evidence, which is "in accord" with the prior Louisiana law. The article states:
"When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This Article does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or for attacking credibility".
There is no question that the responsibility of Sears in this instance is the same as that of the manufacturer. Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La., 1978).
"Contributory negligence does not apply in strict products liability cases. The principle of comparative fault may be applied in some products cases according to precepts formulated by analogy to the principle of Civil Code article 2323." Bell v. Jet Wheel Blast, Div. of Ervin Ind., 462 So.2d 166 at 172 (La., 1985).
Halphen, supra, states: "[A]ny discouragement to produce new products or to discover safety improvements will be mitigated by the manufacturer's ability to defend failure to warn cases, alternative design cases, and alternative product cases on the basis of scientific unknowability and inability." 484 So.2d at 118. A seller is required to give reasonable warnings about dangers of which he has knowledge or should have had knowledge.

CONCLUSION
Although there were no witnesses to the actual accident other than the three year old victim, there is little question about what occurred. The evidence establishes that gasoline leaked from the gasoline powered lawnmower which had been used earlier in the day by twelve year old Richard Toups, Jr., and a friend to cut the grass. The vapors from the gasoline accumulated under the hot water heater. When the burner ignited, the vapors were sucked into its air intake system to cause a flash-back explosion. There was ample testimony about the characteristic sound of such an explosion, described by expert Mandell as a "woosh".
Despite defendants' suggestion that young Shawn Toups was playing with gasoline, neither the palms of his hands nor the soles of his feet were burned, which negates any possibility that he was handling gasoline or kicked over the gas can to cause the fire. Had Shawn been pouring gasoline, his hands would have been burned. Had he been standing in a pool of gasoline, the soles of his feet would have been burned. After the explosion, the gas can was upright on the floor and virtually undamaged. Apparently Richard Toups, Jr. left the gasoline can on the floor, but the lay and expert testimony proves that the gas can was not the source of the fire. It did not explode, which would almost certainly have occurred had it been sitting in a pool of burning gasoline. According to the disinterested testimony of Captain Dauterive, leakage from overfilling the lawnmower caused the explosion.
The physical evidence, including the pattern of Shawn's injuries, plus the pattern of the damage to the gas can and the lawnmower, all implicate the hot water heater as the source of a flash-back explosion.
The jury apparently concluded that this hot water heater was not defective because it was a standard model similar to countless others on the market at the time. Because of erroneous trial rulings, the jury did not have the benefit of the manufacturer/vendor's knowledge of the hidden danger inherent in this hot water heater. The jury was unaware that precautionary warnings were not only needed but were subsequently added to later Sears' models and manuals, proving that they were feasible. In addition, the jury was not specifically asked about Sears' failure to warn its consumers of the danger involved in having gasoline appliances within fifteen feet of *818 the hot water heater. See Chappuis, supra.
The "Neiss News" confirmed Mandell's testimony that there should have been a warning against storing any gasoline or gasoline powered equipment in the same room as a water heater. The "Neiss News", of course, does not prove that this particular gas hot water heater was defective, but it is highly relevant on the issue of Sears' failure to warn its consumers about the danger of flammable vapors. As an official publication, it should have been allowed in evidence.
Halphen, supra, notes that a manufacturer/professional vendor's responsibility for failure to warn is governed by the standard of knowledge available to the manufacturer/professional vendor at the time. The knowledge available to the manufacturer/professional vendor is highly probative on the issue of failure to warn.
The "Neiss News" of 1974 was evidence of knowledge available to Sears before the accident and should have been allowed in evidence to show information which was available to the manufacturer when this product was made. It established that the necessity of a warning, in fact added after this accident, was known to the manufacturer/vendor. Excluded as hearsay, the "Neiss News" was not proffered for the truth of its content but as evidence of information which was available to the manufacturer/vendor. Irrespective of its accuracy, it should have alerted Sears to inquire about the need for a warning.
The fact that a 1975 recommendation for a vapor warning on hot water heaters was published in 1976, probably before this hot water heater was manufactured, was also relevant on the question of duty to warn.
The fact that a manufacturer/vendor knew or should have known that a product warning was needed, i.e., the "Neiss News", and exclusion of evidence that such a warning was in fact subsequently installed on the product are highly relevant and probative as to the manufacturer/professional vendor's duty to provide such a warning. The trial court erred in excluding this evidence which, in toto, might well have persuaded the jury that a warning was needed.
According to designer Wenzel, a warning on this hot water heater about ignition of flammable vapors was unnecessary. The fact that Sears subsequently added a warning to its water heaters contradicted Wenzel's testimony that such a warning was unnecessary and should have been admitted into evidence to challenge his credibility. It would be specifically admissible under Art. 407 of the Proposed Louisiana Code of Evidence, which is in accord with prior Louisiana law. Fontenot, supra. The rule excluding evidence of remedial changes in cases based on negligence has no place in the products liability field when credibility and precautionary measures, i.e., warnings and/or alternative designs, are at issue.
The charge that contributory negligence was a defense must have confused the jury. Even if that defense were available,[23] it was inappropriate here. Shawn Toups was incapable of negligence. Considering his age, any carelessness of twelve year old Richard in leaving the gas can on the floor falls short of negligence,[24] and Mrs. Toups cannot be faulted for allowing her child to be alone for a few minutes.[25]
The trial court erred in instructing the jury that: "a seller or vendor of a product is not presumed to know of any latent defects in the product he sells."[26] There was no question at trial that Sears, which marketed the product under its brand name, was a professional vendor, with the same responsibility as the manufacturer.[27] *819 In this factual context, the instruction, even though later corrected and qualified, was erroneous.
The phrase "duty to warn" can be misleading because it tends to focus attention on the reasonableness of defendants in failing to give a warning and strict liability should not focus on the question of fault. This is the basis for the distinction in Halphen between products which are "unreasonably dangerous per se" and those strict liability cases based on failure to warn of foreseeable dangers. In the latter, a balancing test is used to determine whether the manufacturer could have reasonably known of the danger and should have issued a warning.[28]Hunt, supra. The simplistic jury charge that a design is not defective if reasonable care is taken in its adoption was inaccurate. It did not explain the balancing test required in failure to warn cases.
The jury interrogatories failed to inquire whether the hot water heater was defective for lack of a warning, a trial error which must have influenced the jury's verdict.
In sum, the numerous trial errors here resulted in a jury verdict that was clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La., 1979), on remand 370 So.2d 1262 (La.App. 3 Cir., 1979), writ den. 374 So.2d 660 (La., 1979).
When Sears' prior knowledge is considered in conjunction with adoption of later warnings, the inescapable conclusion is a breach of the duty to warn.
Had there been a warning on the hot water heater, would the Toups have heeded the warning? Would the lawnmower and the gas can have been kept in the lean-to with the hot water heater if a warning had been clearly posted on the hot water heater advising that such storage was dangerous and might result in the ignition of flammable vapors? Mrs. Toups and even her twelve year old son knew that gasoline is flammable. They were unaware that gasoline vapors gather toward the ground where they can be sucked into the low level air intake system of a hot water heater.[29] Defendants' expert Wenzel admitted this was not a matter of common knowledge, an admission confirmed by Mrs. Toups' testimony and the "Neiss News".
It is presumed that informed consumers will heed warnings designed to preserve their safety. "The causal relationship between the injury to plaintiff and the absence of a warning about a danger known to the manufacturer is adequately demonstrated." Chappuis, supra, 358 So.2d at 930. Breach of the duty to warn was clearly a cause-in-fact of Shawn Toups' injuries.
For the foregoing reasons, the judgment of the court of appeal is reversed, and the matter is remanded to the court of appeal to fix the quantum of damages.
REVERSED AND REMANDED.
DENNIS, J., concurs with reasons.
LEMMON, J., concurs in result.
MARCUS, J., dissents and assigns reasons.
COLE, J., respectfully dissents.
*820 DENNIS, Justice, concurring.
I respectfully concur.
The evidence established that the manufacturer failed to provide an adequate warning of a danger inherent in the normal use of the gas burning water heater which was not within the knowledge of or obvious to the ordinary user. Halphen v. Johns-Mansville Sales Corp., 484 So.2d 110 (La. 1986); Winterrowd v. The Travelers Indemnity Co., 462 So.2d 639 (La. 1985) and Chappuis v. Sears, Roebuck & Co., 358 So.2d 926 (La.1978). This danger was that ground hugging, heavier-than-air gasoline vapors could drift along surfaces for as much as six feet, even in a well ventilated area, and be ignited by the water heater's pilot or main burner located two inches above the floor. This risk is to be distinguished from the obvious danger that other gasoline vapors, unlike the ground hugging variety, rise and may be ignited by a flame or spark located immediately above the liquid gasoline. (Arguably, however, the manufacturer of a natural gas water heater has a duty to warn the consumer even of this obvious danger because the hidden nature of the pilot and main burner may present an unreasonable risk of harm to substantial classes of inattentive, youthful or inexperienced persons.)
The jury's verdict that the water heater was "not defective" is not entitled to deference on the issue of adequate warning. First, reasonable minds could not disagree that on the evidence in this case the manufacturer owed a duty to warn consumers of the non-obvious danger that the heater could ignite gas vapors drifting at surface level. Second, the jury verdict should not be considered dispositive of this issue in any event, because the question was not properly submitted to the jury. The trial court did not adequately communicate to the jury that it could find the manufacturer liable for failure to warn of a non-obvious product danger, even if it did not find the product defective for other reasons. In the absence of coherent instructions and well framed interrogatories on the warning theory, the average lay juror probably did not intend that by finding the product "not defective" he also found that the manufacturer owed no duty to warn of its non-obvious dangers.
Furthermore, the jury's verdict was flawed because the trial court's jury instructions invited the jury to decide the case on negligence rules despite the fact that the plaintiffs sought recovery only in strict products liability. The strict liability instruction contained impermissible elements of negligence. The negligence instruction was unfocused and not restricted to the parties to whom it might properly apply. The instructions on contributory negligence and assumption of risk were incorrect and unwarranted with respect to the three year old child's conduct. The instruction that the child's fault was not at issue was not sufficient to guard against the application of contributory negligence and assumption of risk to the child's behavior.
I agree with the majority that an independent examination of the evidence indicates that the accident resulted from low level gas vapors drifting into the water heater from some distance away. However, I find it unnecessary to consider whether the Niess Report or the subsequent remedial measures should have been admitted into evidence and therefore disagree with the portions of the majority opinion treating these issues. I also disagree in part with the majority's statement of the manufacturer's duty to warn at one point in the opinion. The manufacturer in performing his duty to warn is held to the knowledge and skill of an expert; he is not presumed to know of dangers in the product of which an expert would not have been aware.
MARCUS, Justice, dissenting.
I do not consider that the jury was clearly wrong in concluding that the hot water heater was not defective either in design or by reason of the manufacturer's failure to adequately warn. Accordingly, I respectfully dissent.
NOTES
[1] Plaintiffs are Emerza S. Toups and Richard S. Toups, Sr., individually and as parents, administrators and natural tutors of their minor son, Shawn M. Toups.
[2] The water heater was marketed by Sears Roebuck and Company, Inc., under the Sears brand name but was manufactured by State Industries, Inc., another defendant. Sears' name is used here for the purpose of simplicity.
[3] 499 So.2d 344 (La.App. 4 Cir., 1986).
[4] 501 So.2d 202 (La.,1987).
[5] Tr., Vol. 8, p. 266.
[6] Exhibits P-38 and P-39.
[7] Exhibit P-43.
[8] Exhibit P-57.
[9] Tr., Vol. 12, p. 143.
[10] Tr., Vol. 12, p. 160.
[11] The greatest damage was to the left front wheel.
[12] Tr., Vol. 13, p. 91.
[13] Tr., Vol. 17, p. 241.
[14] Tr., Vol. 13, p. 23.
[15] Tr., Vol. 16, p. 238.
[16] Tr., Vol. 17, p. 222.
[17] Tr., Vol. 17, p. 164.
[18] Tr., Vol. 18, p. 20.
[19] Tr., Vol. 18, p. 21.
[20] Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 at 113 (La., 1986).
[21] Halphen, supra, at pp. 114-115.
[22] There is an extensive discussion of the admissibility of subsequent remedial measures in strict liability actions at 39 Wash. & Lee L.Rev. 1415.
[23] See Bell v. Jet Wheel Blast Div. of Ervin Ind., supra.
[24] Plauche v. Consolidated Companies, 235 La. 692, 105 So.2d 269 (1958).
[25] Smolinski v. Taulli, 276 So.2d 286 (La., 1973), on remand 285 So.2d 577, writ den. 288 So.2d 644 (1974).
[26] Tr., Vol. 18, p. 21.
[27] "The responsibility of Sears is the same as that of the manufacturer. First, it held the product out to be public as its own. Penn v. Inferno Manufacturing Corp., 199 So.2d 210 (La. App. 1st Cir.1967). Second, the size, volume and merchandising practices of Sears, unlike those of Reliable Motors in Spillers v. Montgomery Ward et al, 282 So.2d 546 (La.App. 2d Cir. 1973), bring Sears within the class of `professional venders,' who are presumed to know of the defects in their wares. See Morrow, Warranty of Quality, 14 Tul.L.Rev. 529, 539 (1940). Reliable Motors, Inc., was a relatively small truck retailer. The relationship between a retailer like Sears and its manufacturers on the other hand, with its capabilities for controlling the quality of its merchandise, justifies the imputation to Sears of knowledge of its defects." Chappuis v. Sears Roebuck & Co., 358 So.2d 926 at 930 (La., 1978).
[28] Under a minority view, epitomized by Beshada v. Johns-Manville Products Corp., 90 N.J. 191, 447 A.2d 539 (1982), the inability of a manufacturer to know or warn of a danger, i.e., its culpability, is irrelevant to the question of liability.
[29] Melancon v. Western Auto Supply Co., 628 F.2d 395 (5 Cir., 1980) held that the danger of explosive gas fumes combined with an ignition source is not obvious to a typical consumer.