hLOBRANO Judge.
In this pre Products Liability Law case,[1] we are called upon to decide if the trial court was clearly wrong in its determination that the container chassis which plaintiff struck was not defective in its design.
The procedural history of the case and its facts, as well as plaintiffs assertions at the time of trial, are as follows:
On November 26, 1986, the day of the accident, Melville Maher was an employee of New Orleans Marine Contractors, Inc. (NOMC) working as a shipping clerk. Maher worked primarily at the France Road docks which abut the Industrial Canal in New Orleans. The France Road docks are divided into four berths. Berths 5 and 6 were leased to NOMC.
On the day of the accident, the vessel Olandia was docked in berth 6 where it was being unloaded by stevedores hired by NOMC. No vessel was docked in berth 5. The unloading of the Olandia began in the afternoon and continued into the early evening. Normally Maher worked in the gatehouse area which monitored the movement of trucks into and out of the NOMC terminal. ^However, on the day of the accident, Maher was working in the area of berth 6 as the ship was unloaded.
Shortly before finishing his work, Maher got into a small 1980 Chevrolet pick up truck owned and maintained by NOMC. Maher was using the truck to return a coat he had borrowed from a man located at the other end of the dock. It was nightfall, between 5:20 and 5:45 p.m. When Maher left the area of berth 6, it was brightly illuminated. The lights had been turned on by Captain Jerry Lului, a security guard employed by New Orleans Private Patrol (NOPP). NOMC had contracted with NOPP to provide security services at the dock. One of NOPP’s duties included turning on the berth lights every evening. Berth 5 however, unlike berth 6, was dark. The NOPP guard failed to turn on the berth 5 lights. At the time Maher left berth 6 he was driving the truck without turning on the headlights. As Maher drove from the illuminated berth 6 area into the berth 5 area, the truck struck the front of a forty foot gooseneck container chassis manufactured by Theurer in 1983 for Evergreen Lines, a steamship company. The chassis was not loaded and was not attached to a tractor. The left arm of the chassis’ bolster sheared the cab of the truck striking Maher in the head causing severe injuries. At the time of the accident, the security lights on the dock, which were sup *1305 posed to be activated by a photovoltaic cell, were also off.
As a result of the accident, Maher filed suit on November 27, 1987 against Costa Lines (owner of the vessel being unloaded at the time of the accident); Evergreen lines (owner of the chassis); New Orleans Private Patrol (the party responsible for turning on the overhead berth lights); and, the Dock Board (owner of the overhead lights and the security lights which were supposed to illuminate automatically). Also named were various companies and insurers of the ^entities. Costa and the Dock Board were subsequently dismissed without prejudice on August 3, 1990.
On January 16,1992, in a second amending petition, Theurer was added as a defendant. The petition alleged that Theurer was liable because the chassis was defective for lack of “sufficient reflector mechanisms and/or reflector tape and/or reflector paint; ” the presence of which would have caused Maher to see the chassis on the unilluminated dock.
Evergreen was dismissed by summary judgment on October 23,1992. Theurer was subsequently dismissed without prejudice on March 8, 1993. Both Theurer and the Dock Board were then re-named defendants via a third amending petition filed June 18, 1993. The same allegations contained in the second amending petition were again asserted against Theurer. Maher contended that the defective design of the chassis together with the nature of its foreseeable use on the dock, rendered it dangerous for normal use. Subsequently, on January 31,1996, in answers to interrogatories, Maher alleged that an alternative design consisting of a self-activated flashing light warning system was technologically feasible in 1983 when Theurer built the chassis and would have eliminated the defect.
Maher settled with NOPP and dismissed it from the suit on July 29, 1993. The Dock Board was dismissed via summary judgment on September 14, 1994. At the time of trial, February 26,1996, only Theurer remained as a defendant.
Applying the principles enunciated in Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986), the trial court con-eluded that the chassis was not defective and plaintiffs alternative design was not feasible. UPlaintiffs perfect this appeal asserting two errors, one factual and the other legal. First they argue that the trial court was manifestly erroneous in rejecting the uncontradieted testimony of their expert, Dr. Ziedman, who concluded that the chassis was defective in design because it was not sufficiently conspicuous. Second, they argue that the trial court committed legal error by utilizing a “risk-utility” test in concluding that plaintiffs’ alternative design was not feasible. For the following reasons we affirm.
Initially we make the general observation that a manufacturer of a product may be held hable for injuries caused by the use of its product without a showing of negligence if the plaintiff proves there was a defect in the design or manufacture of the product, the product was in normal use, the defect caused an unreasonable risk of harm and the plaintiffs injury was caused by the defective product.[2] Allen v. Traffic Transport Engineering Incorporated, 496 So.2d 1122, 1124 (La.App. 4th Cir.1986), writs denied, 501 So.2d 208 (La.1987). Halphen and its progeny made clear that a product can be defective by reason of its design where, either: (1) a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product or (2) if the product is not unreasonably dangerous per se, alternative products were available to serve the same needs with less risk of harm or (3) even though the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences. See, Toups v. Sears Roebuck and Co. Inc., 507 So.2d 809 (La.1987).
In the instant case, plaintiffs base their claim on the third category of liability. However, presumably relying on the trial court’s written reasons, | gplaintiffs infer that the court made two findings; one, that the chassis was not defective and two, that the alternative design was not feasible. Although the grammatical structure of the *1306 court’s reasons do suggest that inference, as a practical matter there is only one finding, and that is that the chassis was not defective in design because plaintiffs failed to prove a feasible alternative design that would produce less harmful consequences. Because plaintiffs have pigeonholed their theory of liability on the third category of design defect, the court was required to make only that one finding. Thus, our inquiry is limited to consideration of that issue within the context of plaintiffs assertions that the trial court erred in rejecting Dr. Ziedman’s testimony and erred in utilizing the utilities-risk test in determining the feasibility of the alternative design. And, we start with the premise that the utility of the chassis outweighs any danger-in-fact since that is the premise upon which the plaintiffs’ theory of liability is based. A review of the expert testimony is necessary.

DR. KENNETH ZIEDMAN:

Dr. Kenneth Ziedman, a PhD. in experimental psychology, testified as an expert in the field of human factors, which studies how people interact with their environment. In this capacity, he explained that he reviewed and considered the design of the chassis and concluded it created the hazard of inadequate conspicuity given the dock environment in which it was used.
Dr. Ziedman described the accident that occurred as a type of undemde accident. That type was well documented in 1988. He opined that the remedy of this problem consisted of a flashing light system that flashed the side marker lights as well as the tail lights. Dr. Ziedman stated that the flashing lights lesystem could easily be installed on the chassis because flashing lights were already a part of the chassis when hooked to a truck cab. The system would not require additional lights but only require a separate power source, a flashing unit and a means of maintaining the power supply. He testified that flashing light systems as highway warning devices were used for years prior to 1983.[3] He admitted, however that had Maher used his headlights he would have seen the chassis. Regardless, this fact did not change his opinion since many underride accidents occur even when headlights have been used.
On cross-examination, Dr. Ziedman admitted that he never conducted any studies from a human factors standpoint of when drivers turn on their headlights. He remembered only one study after 1983. He stated that he did not know of any study of the conspicuity of vehicles in the dark which were approached by drivers with their headlights off. In addition, he stated that he was not aware of any study documenting accidents of the type that occurred in this ease.
Furthermore, Dr. Ziedman admitted that in all of his years of experience he had never seen a self-activated, self-powered flashing light system on an unattended chassis. He also admitted that it was not until he was asked by plaintiffs’ counsel, in the context of this lawsuit, that he ever conceptualized the installation of such a system. He stated that unattended flashing light systems were in use on highway barricades, but he had never recommended such a system on a transportation vehicle. The Vector Study did not consist of self-powered flashing light systems, but primarily retroreflective materials on vehicles.
|7Pr. Ziedman further admitted that he did not perform any detailed analysis of how a self-powered, self-activated flashing light system would be installed or maintained on the chassis. In that regard he deferred to Dr. Rosenblouth’s expertise. He did state that all of the individual components of such a system were available in 1983 but that the design proposed by himself and Dr. Rosenb-louth was not a final design and that “some additional analysis would need to be done to arrive at a final design.”

GERALD ROSENBLOUTH:

It was stipulated that Gerald Rosenblouth is an expert in the design, manufacture, assembly, installation and application of automotive systems, including but not limited to lighting systems. Rosenblouth testified that he was asked by plaintiff to design a concep *1307 tual system relative to the emergency lighting of a container chassis, although he was never asked to turn out. a finished system. He explained that he has never held his design concept as one that could be taken to production or mass produced. The system suggested was one that would require only the addition of a battery and flash unit and photocell. He produced a conceptual prototype for demonstration purposes. Rosenb-louth felt his design was feasible because the component parts and knowledge needed to build the system existed in 1983.
Rosenblouth opined that the system’s power source could utilize either one truck/tractor 600 ampere hour battery or, for longer life, two 800 ampere hour batteries. With all six lights flashing using 3 amperes each, the 600 ampere hour battery would last a minimum of 40 days. This estimate was based on a 50% duty cycle with the chassis being used daily or at least once per month. Rosenb-louth Igopined that if the chassis were not used at least once per month then the system would need a solar panel to completely recharge the battery. He estimated the cost of the system to be between $50.00 and $150.00. For long storage periods, Rosenblouth suggested an on/off switch would be designed for the system.
On cross-examination, Rosenblouth admitted that all the systems he previously designed were for motorized vehicles.- He stated that to his knowledge no chassis manufacturer in 1983 included this system or a prototype of this system in its chassis design or manufacture. He even admitted that no such system or design exists today.
Rosenblouth, like Dr. Ziedman, testified that he conceptualized this suggested system only in the context of this lawsuit. He admitted that many factors must be considered when designing a system, including cost, environmental factors, maintenance and personnel and staffing to supply and repair the system. When questioned about the feasibility of using liquid electrolyte batteries such as truck/traetor batteries, Rosenblouth admitted that these could cause problems with acid leakage during storage. He then suggested that to eliminate this problem dry cell batteries could be used. He stated that dry cell batteries could run the system for 12 to 16 weeks.
Rosenblouth testified that he did not calculate the size of a solar panel necessary to recharge a dead battery, and explained that the solar panel would only be used to “top of’ the electrical charge to boost it back to its proper level. It would not recharge a “dead” battery. In his opinion, the proper functioning of the system would depend on the driver properly connecting the electrical plug to the truck cab. If this is not done, then the system is useless because the systems batteries would loose their charge. When questioned about this very real [¡¡possibility, Ro-senblouth then opined that he would have to add an electrical safety valve to the air brake system. This safety valve would act to prevent the vehicle from being used in the event the electrical cord is not connected. Rosenb-louth agreed that the addition of this component would require additional cost as well as maintenance. In the final analysis, Rosenb-louth admitted that the system had to function in the real world.

CHRISTOPHER FERRONE:

Theurer’s witness, Christopher Ferrone, was recognized as an expert in mechanical engineering with special knowledge in the area of maintenance operation and application engineering of heavy vehicles. He concluded that the Rosenblouth system was not feasible in 1983 or even now for a number of reasons, the most significant being the necessity of an independent power source capable of property supporting the system.
Ferrone stated that the gell cell battery used in the Rosenblouth “prototype” was most likely not even available in 1983. He further stated that even in tests that he conducted using a gell cell battery twice the size of the “prototype” battery, the battery lost all power within 4 hours of continuous use. In addition, Ferrone discounted the use of auto batteries as they too would loose all power by daylight. He testified that charging separate batteries through the truck/cab electrical system was not possible because the truck/cab battery only has enough power to sustain its own life through its alternator. There is no extra power available to sustain a second or even a third battery system. In *1308 addition, Ferrone described the tractor electrical plug as a 7 pin connector with each pin dedicated to a particular electrical path. To recharge or keep charged another | mseparate system would require additional pins which would require the design of another pin system to provide a path to the chassis power source.
Ferrone also explained that the existing wiring system on the chassis is inadequate to carry the needed amperage. Use of the existing wires would cause overload and possible overheating. In addition, the use of more than one battery, as suggested by Ro-senblouth, would require the addition of a voltage regulator to equally distribute the power. Otherwise, a low battery would drain power from the other battery, rendering both useless.
Ferrone discounted Rosenblouth’s solar panel solution as a means of battery maintenance. He pointed out that the panel described by Rosenblouth would only maintain the batteries by a “trickle charge”, but could not recharge a dead battery. In order to accomplish that, Ferrone opined that a solar panel measuring 2 feet by 4 1/2 feet in size, properly exposed to the sun, would be necessary. Cloudy and overcast days would affect its efficiency.
Besides power source problems, Ferrone also testified as to weight, environmental, storage, maintenance, repair and complexity problems with the Rosenblouth system. He described a chassis as a load sensitive vehicle which by law cannot exceed certain weight limits. Each truck battery weighs approximately 80 pounds. In addition to the battery weight, the weight of the other suggested components would have to be considered— the mounting boxes, solar panel and control system.
Extremes of cold and heat affect battery life. Since these chassis are used all over the world, the system would have to be compatible with all climates. Because batteries give off hydrogen gas, smoking around the chassis would have to be controlled or prohibited to avoid explosions.
| nFerrone testified that these chassis are used in rail yards and, to save storage space, are stacked on end. This prevents the use of batteries because batteries, whether liquid electrolyte or maintenance free, must be stored upright to prevent leakage. Leakage would drip acid onto the brakes, wires and other components causing damage. In addition, welding is the primary repair method used on these chassis. Welding around batteries can cause an internal short and increase the risk of explosion.
Ferrone estimated the cost of the Rosenb-louth system to be between $400.00 and $800.00 for parts, not counting labor, or the cost of the air brake safety switch component suggested by Rosenblouth. He opined that daily maintenance and inspection would be needed because any chassis could be called into service on any given day. The labor and parts cost for this maintenance and inspection would also have to be factored into the overall cost of the system.
Extensive operator involvement would also be required to keep the system operational. The operator would be required to plug in the electrical cord, make a determination at some point when and if to override the system for storage or parking in a safe area. These decisions would be dependent solely on his judgment. Also, he stated that the possibility of damage to the system would be quite high because the area of the bolster arm, where Rosenblouth proposed installing the power source, is the primary area where the chassis sustain work related damage. For all of these reasons, Ferrone opined that Rosenblouth’s system would not be feasible.

Ji¿ANALYSIS:

Plaintiffs argue that Dr. Ziedman’s opinion about the chassis’ eonspieuity problem was uncontradicted and that the court erred in rejecting it because Theurer did not offer expert testimony to refute that issue. We find nothing in the court’s reasons to conclude that Dr. Ziedman’s testimony on that issue was rejected. In fact, neither this court nor the trial court requires expert testimony to conclude that an object, regardless of size or configuration, is inconspicuous in the dark. However, that conclusion does not end the inquiry.
The trial court did reject Dr. Ziedman’s testimony that the chassis was defective be *1309 cause it did not incorporate in its design Rosenblouth’s flashing light warning system. Although a trier of fact should accept as true the uncontradicted testimony of an expert, the alternative design portion of Dr. Zied-man’s testimony was not uncontradicted. In fact, he did not testify as to the 1983 feasibility of such a system, nor did he elaborate on the details of its design, installation or maintenance. On those questions, Dr. Ziedman deferred to the expert testimony of Rosenb-louth. And, Rosenblouth’s testimony was definitely contradicted by Theurer’s expert, Christopher Ferrone. Which brings us to the second argument.
Plaintiffs next argue that the trial court erroneously accepted Ferrone’s testimony which they claim used the LPLA risk/utility balancing test to support his opinion that Rosenblouth’s suggested alternative design was not feasible. Plaintiffs claim that pursuant to Halphen, they needed only to demonstrate that a safer alternative design was “technologically feasible” in ■ 1983, meaning that the component part technology existed to build the system (batteries, wires, switches, lights, solar panels, etc). Plaintiffs assert that the suggested alternative design need not have actually existed, been proposed or have been tested at the time the | isproduct was manufactured, only that it could have been done. Simply put, plaintiffs contend that if it could have been built in 1983 then it is a feasible alternative design which would have reduced the hazards, and thus the product was defective.
In support, plaintiffs cite a number of cases where manufacturers were held liable for failing to incorporate an alternative design in their product. We find these eases are not dispositive of the issue as each is distinguishable.[4]
I i/Theurer, on the other hand, argues that at the time the chassis was manufactured, the alternative design must be a design avail *1310 able, or at least,known to the manufacturer. Theurer contends that its position is fully supported by the pre-LPLA case law.[5]
In order to resolve this case, we need not decide whether, as a matter of law, an alternative lighting system for the chassis was actually available and on the market in 1983. We need only determine whether the trial court erred in finding that the design presented by plaintiff was not feasible.[6] The key determinative word is feasibility. Hal-phen requires that the alternative design be feasible. Plaintiff argues that feasible means “capable of being done.” We disagree.
In the context of this case, and Halphen’s defective design theories,- feasibility means “capable of being utilized successfully.” See, Webster’s Third New International Dictionary of the English Language. We conclude that, for any number of reasons, the trial judge was correct in finding that plaintiffs’ alternative design was not feasible. It could not accomplish its intended purpose successfully and was an untested, unproven idea. Rosenblouth’s ever-evolving concepts when I igconfronted on cross-examination with specific problems, coupled with Ferrone’s straight-forward testimony, convinces us that, although the flashing lights could probably have been built in 1988, they could not be operated successfully.
No final working design was available in 1983 or at the time of trial. Rosenblouth testified that he had no intention of refining the system to reach a finished design. Each time he was confronted with certain potential problems, he opined a solution that required a change to his original design. This is best illustrated by his response to the question of operator negligence in connecting the electrical cord to the power system. At that point he suggested incorporating an air powered braking system using a safety switch which would immobilize the chassis in the event the operator failed to connect the electrical cord. This added design feature was conceptualized during his testimony in order to answer the specific question. This same type of response was true when he was asked questions concerning other potential problems such as adequacy of the power source, battery leakage and stacking problems. After reviewing his testimony we are satisfied that the feasibility details of his suggested light system were never fully considered or proven.
The testimony of Christopher Ferrone shows a more in-depth analysis of the suggested design and supports the trial court’s conclusions. It convincingly establishes the many problems that Rosenblouth’s design presents. Those problems are not the result of a utility risk balancing test done by Fer-rone, or the trial judge, but are basic to the operation of the system. It is not a question of weighing the system’s utility because the evidence never proved that the system would work.
It is clear to us that the alternative design suggested by plaintiffs was conceptualized and designed after the fact and in response to the particular facts |i6of this case. Although, as a matter of law, that may not be a fatal flaw[7] we need not reach that conclusion *1311 because the design is simply not feasible. For that reason, we affirm.
AFFIRMED.
SCHOTT, C. J., concurring with reasons.

. The Louisiana Products Liability Act, La. R.S. 9:2800.51 became effective September 1, 1988. The accident in this case occurred November 26, 1986. See, Gilboy v. American Tobacco Co., 582 So.2d 1263 (La.1991).

. The law we recite is as it existed prior to the enactment of LPLA.

. Dr. Ziedman testified at length about the Vector Study which was conducted to find ways to enhance conspicuity of larger vehicles on highways to prevent underride accidents.

. In Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96) 666 So.2d 1073, a passenger was killed in a 1986 rear-end collision when the seat track broke causing the passenger to be thrown backwards into the rear-ending vehicle. The court found for the plaintiff on the theory of an alternative design available to the manufacturer. At the time of the manufacture of the vehicle, there existed a better and safer track system called a "T” into channel system. This better, safer system was used by other manufacturers who knew of the problems with the type “C" track used by Volkswagen.
In Hooper v. Crown, 93-2021 (La.App. 1st Cir. 10/7/94) 646 So.2d 933, writ denied, 95-0179 (La.3/17/95) 651 So.2d 275, a standup forklift operator was injured in 1986 when he was thrown from the forklift. Plaintiff sued and recovered based on an alternative design claim. The court found that at the time of the manufacture of the forklift, operator restraints were used in sit down forklifts and therefore were available to be used in stand up forklifts.
In Davis v. Commercial Union Insurance Co., 892 F.2d 378 (5th Cir.1990), a worker was injured in 1985 when his hand got caught in a lint cleaning machine. Plaintiff sued claiming the machine was defective for failing to incorporate an interlock devise that would shut off the equipment when the guard was removed. The plaintiff prevailed because the court found that such an interlock device had been developed in 1982, the manufacturer was informed of the device but chose not to incorporate the device in the machine.
In Habecker v. Clark Equipment Co., 942 F.2d 210 (3rd Cir.1991), the plaintiff was injured in 1977 when he was thrown from his forklift and crushed. Plaintiff sued alleging alternative design defect for failure to incorporate an operator restraint system. The defendant manufacturer conceded that an operator restraint system was feasible at the time. The only issue was whether or not having one rendered the forklift defective.
In Toups v. Sears Roebuck & Co., Inc., 507 So.2d 809 (La.1987), plaintiff was severely burned as a result of a flash fire involving a water heater. The plaintiff was a three year old child. The accident happened in 1977. The water heater was installed 2 inches off the floor in a shed with gasoline cans and lawnmowers.
This case did not turn on the issue of alternative design but on a lack of an adequate warning not to place gasoline powered machinery within 15 feet of the heater.
In Barker v. Deere and Company, 60 F.3d 158 (3rd Cir.1995), plaintiff was injured when he was thrown from his tractor after being struck from behind by a log that he was towing. Plaintiff sued alleging defective design for failure to use an operator protective system (OPS). Plaintiff prevailed in the district court. On appeal, the case was reversed and remanded for a new trial finding that the evidence of other ejection accidents were not substantially similar to plaintiff's accident. On the issue of an alternative design, the Court did not rule on the merits but merely determined that the non-existence of such a design did not operate to keep the question of feasibility from the jury.
Note: Plaintiff's expert in the first trial, testified that OPSs were first developed for the logging industry prior to 1940.

.In addition to citing several cases also cited by plaintiff, Theurer cites Thompson v. Tuggle, 486 So.2d 144 (La.App. 3rd Cir.1986), writ denied, 489 So.2d 919 (La.1986) and Lopez v. Chicago Bridge and Iron Co., 546 So.2d 291 (La.App. 3rd Cir.1989), writ denied, 551 So.2d 1323 (La.1989).
In Thompson, the alternate design of a chainsaw chain brake was standard equipment on the chainsaw sold abroad by the defendant manufacturer and offered as an option on defendant's chainsaws sold in the United States.
In Lopez, the alternative design using jack screws to break the sealed gasket on an autoclave had already been used in numerous similar applications for years prior to the accident.

. Thus we decline to say, as a matter of law, that the system actually had to be available and on the market when the chassis was built.

. We find no case law which states, as a matter of law, that a design conceptualized after the fact, in response to a specific lawsuit, cannot be used as an alternative design. In Delphen v. Dept. of Transportation and Development, 94-1261 (La.App. 4th Cir. 5/24/95), 657 So.2d 328, 334, writs denied, 95-2116 (La.11/17/95), 663 So.2d 716, 95-2124 (La.11/17/95), 663 So.2d 717, this Court, in dicta, addressed a claim of alternative design feasibility where one manufacturer used a patented device which was not available to the other manufacturers in the industry. The Court also noted that other similar devices were not. developed or feasible at the time. *1311 However, liability in this case turned on the issue of a failure to warn.