412 So.2d 191 (1982)
Dudley Joseph CAMPBELL, Plaintiff-Appellee,
v.
Edmond MOUTON and Pete Reaux, Defendants-Appellants.
No. 8696.
Court of Appeal of Louisiana, Third Circuit.
March 10, 1982.
Rehearing Denied April 29, 1982.
Writ Denied June 11, 1982.
*192 J. Barry Mouton, Lafayette, for defendants-appellants.
D. Warren Ashy, Lafayette, for plaintiff-appellee.
Before CULPEPPER, GUIDRY and STOKER, JJ.
*193 STOKER, Judge.
This is a suit for personal injuries sustained by the plaintiff allegedly as a result of a barroom brawl. The case was originally dismissed by the trial court when it granted defendants' motion for a directed verdict. This court reversed that dismissal and remanded the case for a new trial. Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir. 1979). A jury trial was held on remand in which the jury rendered a verdict against the defendants, Edmond Mouton and Pete Reaux, in solido, for $125,000. The trial court denied defendants' motion for new trial and remittitur and assigned written reasons for the denial. Defendants appeal the judgment of the trial court, alleging as error that (1) the jury verdict is contrary to the evidence and the law; and that (2) the award is excessive and not supported by damages proven by a preponderance of the evidence at trial.
The facts brought out in this trial are essentially the same as those elicited in the first trial of this matter which are related in our earlier decision. Plaintiff Dudley Campbell was a patron of Star Mist Lounge, owned by defendant Edmond Mouton, on February 26, 1977, in Abbeville, Louisiana. On that evening plaintiff sustained injuries in a fight with defendant Pete Reaux who was tending bar at the lounge at the time. Plaintiff contends that Pete Reaux inflicted his injuries with a knife, but defendant tried to show that it was more likely that plaintiff's injuries were caused by his falling against some wrought iron grillwork in the lounge during the scuffle.

LIABILITY OF PETE REAUX
Three witnesses to the incident, Barbara Plummer, Dudley Guidry, and Riley Trahan, testified for the plaintiff that they saw a knife in Pete Reaux's hand during the fight. One witness, Barbara Plummer, said she saw Reaux stab plaintiff in his armpit. Plaintiff claims to have seen the knife in Reaux's hand only after the fight. Donald Miller, one of the police officers who arrived on the scene after the fight, testified that Reaux gave him a knife on that occasion with what appeared to him to be blood on the blade.
Pete Reaux, the defendant involved in the fight, claims that he did not pull his knife out of his pocket until after the fight was over, and that he did so only to protect himself from further attack. Furthermore, Reaux was the only witness who claims that the plaintiff fell against the wrought iron grillwork. None of the other witnesses to the fight, including two who testified for the defendants, saw Reaux or the plaintiff fall against the grillwork. Thus, the only substantial evidence that plaintiff was injured by any means other than by Reaux's stabbing him with a knife is the testimony of Reaux himself. The jury was justified in its conclusion that plaintiff's injuries resulted from Reaux's tortious conduct.
Defendants further contend that plaintiff cannot recover for his injuries because he was the aggressor. There was ample evidence produced at trial from which the jury could conclude that Reaux, and not the plaintiff, was the aggressor. However, even assuming that plaintiff was the aggressor, Reaux was not privileged to respond with unnecessary force. Even where there is an aggressive act justifying a battery, the person retaliating may use only so much force as is necessary to repel the aggression, and he is liable for damages for injury caused by his use of force in excess of what was reasonably necessary. Tripoli v. Gurry, 253 La. 473, 218 So.2d 563 (La.1969) and Curry v. Bagwell, 379 So.2d 1163 (La.App. 2nd Cir. 1980), writ denied, 383 So.2d 782. Resort to the use of a dangerous weapon in order to repel an attack on one's person is not justifiable except in exceptional cases in which the actor's fear of danger is not only genuine, but is founded on facts which would likely produce similar emotions in men of reasonable prudence. Curry v. Bagwell, supra, and Davis v. Marie, 339 So.2d 370 (La.App. 1st Cir. 1976), writ refused, 341 So.2d 5 (La.1977). There was no evidence in the instant case that Reaux was in genuine fear for his health or life from plaintiff's actions to justify his use of a knife against plaintiff.
*194 For the foregoing reasons, we find no manifest error in the trial court's finding of defendant Reaux's liability.

LIABILITY OF EDMOND MOUTON
Defendants contend that, even if defendant Pete Reaux is liable for damages to plaintiff, that defendant Edmond Mouton, Reaux's employer, should not be liable for the actions of his employee. Defendants cite the last paragraph of LSA-C.C. art. 2320[1] which makes masters or employers responsible for damages occasioned by their servants and overseers only when the masters or employers "might have prevented the act which caused the damage, and have not done it." Defendants contend that Mouton could not have prevented the act which caused the damage to plaintiff and therefore should not be responsible for the damage his employee caused.
This argument ignores the fact that the extent of liability of employers for their employees has been expanded jurisprudentially beyond the limits of Article 2320. In Louisiana, an employer (master) is liable for torts committed by his employee (servant) if, at the time, the servant is acting within the scope of his employment-acting as Civil Code article 2320 phrases it, "in the exercise of the function in which ... employed." LSA-C.C. art. 2320; LeBrane v. Lewis, 292 So.2d 216 (La.1974); Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (La.1968); Comment, 33 La.L.Rev. 110 (1972).
Defendants further contend that Reaux was not acting within the scope of his employment when he fought with and stabbed plaintiff, but that Reaux's motives at the time were strictly personal. Defendants cite the following language from LeBrane v. Lewis, supra, as quoted in Mays v. Pico Finance, 339 So.2d 382 (La.App. 2nd Cir. 1976), writ denied, 341 So.2d 1123 (La. 1977):
"The determinative question is whether the tortious conduct of the employee `was so closely connected in time, place, and causation to his employment-duties, as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests.'"
In LeBrane v. Lewis, the court applied this test and found that an employer was liable for the act of its supervisor in stabbing a discharged employee who was still on the premises, because the fight was reasonably incidental to the performance of the supervisor's duties in connection with firing the employee and causing him to leave the place of employment. Also, the fight occurred on the employment premises and during the hours of employment.
The fight between Reaux and plaintiff in the instant case also occurred on the employment premises during the hours of employment. Furthermore, the fight was reasonably incidental to the performance of Reaux's duties as bartender. It is not unusual for a bartender to be charged with the responsibility of maintaining order in the bar as part of his duties. The evidence shows that Reaux became involved in the altercation with the plaintiff when he was attempting to break up another fight in the bar already underway. Thus, the fight between Reaux and plaintiff was "primarily employment-rooted" as was the fight in LeBrane v. Lewis, supra.[2]
*195 Defendants argue that Reaux was not hired as a "bouncer" and did not have the duty of maintaining peace in the bar. Edmond Mouton testified that he called the law when trouble occurred in the bar. (Tr. 315) This defense alone, however, will not absolve the employer of liability. The fact that Reaux's action was designed to promote the interest and welfare of his employer makes the action one within the scope of his employment, even if the action was ineffective for this purpose or contrary to the employer's orders. See Bordelon v. Great American Indemnity Co., 124 So.2d 634 (La.App. 3rd Cir. 1960), and Starnes v. Monsour's No. 4, 30 So.2d 135 (La.App. 2nd Cir. 1947). In the Starnes case, a bartender's employer was held liable for harm caused by the bartender's forceful ejection of a patron, despite the fact that in doing so the bartender disobeyed direct orders of his employer to always call a policeman to eject obstreperous patrons. Therefore, even if Reaux acted against Mouton's instructions in attempting to break up the fight in the bar, he still was acting within the scope of his employment.
The trial court's finding that Edmond Mouton is solidarily liable with his employee for the latter's tortious conduct is not manifestly erroneous and is hereby affirmed.

QUANTUM
Lastly, defendants contend that the jury verdict awarding $125,000 to plaintiff is an abuse of its discretion because the award is not supported by the evidence. The jury award was a general verdict and we cannot know what value they assessed to any element of plaintiff's injury. However, as pointed out in the trial court's written reasons for judgment denying defendants' motion for a new trial and remittitur, the jury in arriving at a figure must have considered the testimony of the expert witnesses and of the plaintiff himself as to his pain and suffering and disability, especially his inability to hold a job as a welder.
Plaintiff testified that he first became aware of his wounds after the fight at the police station because of a sudden pain underneath his arm. (Tr. 134) Dr. Sydney Crackower testified that it was not unusual to experience a delayed sensation of pain from a wound inflicted when the victim is excited and distracted by other sensory input. (Tr. 291) Dr. Crackower examined the plaintiff on March 4, 1977, six days after the fight, and plaintiff complained at that time of pain and numbness in the left arm extending to the fingers of the left hand. Plaintiff was still affected by this numbness at the time of trial, according to his testimony. While both doctors who testified discounted the possibility of damage to major nerves in plaintiff's arm (Tr. 295 & 303), Dr. J. Lee Leonard, a specialist to whom plaintiff was referred by Dr. Crackower, stated that damage to unnamed sensory nerves under the skin could cause numbness. (Tr. 304) Dr. Leonard last saw plaintiff on June 16, 1977, at which time he was still complaining of numbness. (Tr. 304) Dr. Leonard testified that plaintiff's problems were consistent with injury from a knife. (Tr. 305) He also stated that the damage was probably permanent, considering that plaintiff was still complaining of numbness at the time of trial. (Tr. 305, 306)
As to his permanent disability, plaintiff testified that the continuing numbness of his arm rendered him unable to continue his occupation as a pipe welder. Welders have to be certified for each job they seek by passing a test before employment. Welding requires the use of both hands, and plaintiff testified that the numbness in his arm caused him to fail or "bust" every pipe welding test he had taken since the injury occurred. (Tr. 141, 144) Plaintiff testified that during one test his left arm caught fire twice. (Tr. 142) Other welders testified as to the need of welders to use both arms effectively in their work. (Tr. 254) Two welders testified that they knew that plaintiff had passed welding tests prior to the injury (Tr. 253, 261), but one had seen him *196 "bust" a test after the injury. (Tr. 254) A former employer of plaintiff testified that plaintiff had passed two tests for his company in 1975 (Tr. 268), but he had to fire plaintiff for inferior work in 1978 because he was unable to perform even simple welding tasks at that time. (Tr. 269) Also, Dr. Leonard testified without objection as to his understanding of how an affliction such as that complained of by plaintiff could adversely affect his ability to weld. (Tr. 311-312)
Defendants argue that the only evidence of plaintiff's pain and suffering, numbness, and permanent disability from the numbness is the "subjective" testimony of the plaintiff. The numbness of which plaintiff complains is not provable by objective medical tests. However, neither doctor who testified found that plaintiff's complaints of numbness were inconsistent with his injury. Furthermore, medical testimony is not necessary to prove pain and suffering or disability. Lay testimony is always admissible to prove that which the witness knows about and about which he is legally capable of testifying. Leavitt v. St. Tammany Parish Hospital, 396 So.2d 406 (La. App. 1st Cir. 1981); Smith v. Andrepont, 378 So.2d 479 (La.App. 1st Cir. 1979), writ refused, 380 So.2d 102 (La.1980); Arthur v. McConnell, 286 So.2d 499 (La.App. 2nd Cir. 1973). The testimonies of the welders, of plaintiff's former employer, and of Dr. Leonard adequately corroborate plaintiff's claim of disability to perform as a welder.
Defendants make much of the evidence educed at trial that tended to show that plaintiff retained the use and strength of his left arm. However, plaintiff complained not of the lack of strength, but of the lack of sensitivity and feeling in his left arm which his work required. Under these circumstances, we feel that the jury had sufficient evidence before it to find that plaintiff was permanently disabled as a welder.
Defendants contend further that plaintiff did not prove damages in the amount awarded by the jury. Defendants specifically complain that plaintiff did not show his inability to work at other jobs and he did not introduce evidence to sustain his claim for medical damages.
The testimony of the welders established that pipe welders with their own equipment (which plaintiff had at the time of his injury) made $25.00 per hour at the time of the trial. Plaintiff in his brief before this court provides a competent defense of the jury's verdict based on this fact, as follows:
"The defendants have urged that plaintiff's damages should be reduced based on the fact he could find another type of employment. However, plaintiff went to work as a welder's helper when his education terminated in the eighth grade. He has no formal training in any other trade (Tr. 181). Simple computations will show that the jury could have returned a much higher award and still be within their discretion. Without education or formal training, plaintiff would likely be limited to a minimum wage job, or approximately Three Dollars and Sixty Cents ($3.60) per hour. For the purposes of simplicity, this is about twenty ($20.00) Dollars per hour less than he could make as a certified pipe welder. Assuming the plaintiff worked only six (6) months out of the year, the following figures became apparent. This would be a loss of One Hundred Sixty ($160.00) Dollars a day, based on eight hours a day. On a five day week, this would be a loss of Eight Hundred ($800.00) Dollars per week. Based on six (6) months or twenty-four (24) weeks, this would be approximately Nineteen Thousand Two Hundred ($19,200.00) Dollars lost wages per year."
Based on the fact that plaintiff was 28 years old at the time of the trial, the general jury award of $125,000 to compensate the plaintiff for pain and suffering and future loss of earning capacity does not appear to be an abuse of the jury's discretion, even eliminating plaintiff's special claim of medical damages for lack of proof.
Therefore, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] Article 2320 states:

"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
"Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.
"In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it."
[2] When the case was previously before us on the issue of the directed verdict, 373 So.2d 237, we gained the impression from the evidence in that case that the altercation took place outside of lounge premises. We understood that Reaux invited Campbell outside and the stabbing occurred there. The evidence in the new trial after the remand indicates that the fight took place inside the lounge or bar and followed immediately or soon after the quelling of the fight between the other parties.