546 So.2d 291 (1989)
Randall Keith LOPEZ, Plaintiff-Appellee,
v.
CHICAGO BRIDGE AND IRON COMPANY, et al., Defendant-Appellant.
No. 88-305.
Court of Appeal of Louisiana, Third Circuit.
June 28, 1989.
Rehearing Denied August 1, 1989.
*292 Jones, Jones & Alexander, J.B. Jones, Cameron, for plaintiff-appellee.
Carmouche, Gray, David R. Frohn, and Leithead, Scott, Preston Savoy, Lake Charles, for defendant-appellant.
Jones, Tete, Edward J. Fonti, Lake Charles, for defendant-appellee.
Before STOKER, YELVERTON and KNOLL, JJ.
*293 KNOLL, Judge.
This products liability case focuses on the propriety of a judgment notwithstanding the verdict (JNOV) and whether the trial court erred by not applying LSA-R.S. 9:2772, Louisiana's ten year peremption statute for actions involving deficiencies in the design of improvements to immovables.
Chicago Bridge and Iron Company (CBI) appeals the granting of a JNOV which found it liable for a back injury Randall Lopez received when a 2,700 pound header atop an 85 foot high urea autoclave was removed during a turnaround at Olin Corporation's Lake Charles plant. The trial court, overruling the jury's verdict which exonerated CBI and Lopez, and assigned 100% fault to Olin, found in a JNOV that CBI was 100% at fault because of a defective design in the header, and awarded Lopez $1,122,777.84, subject to Olin's credit for worker's compensation benefits.
CBI contends that the trial court erred: (1) in granting the JNOV; (2) in failing to apply LSA-R.S. 9:2772; (3) by imputing the defective design of Arthur G. McKee & Co. (McKee), the engineering firm, to CBI, the fabricator; and, (4) in making an excessive quantum award ($200,000) for pain and suffering. We affirm.

FACTS
On August 8, 1984, Lopez, who was 30 years of age, and two other Olin employees were doing turnaround work at Olin's Lake Charles facility. At the time of the accident, they were assigned to remove the header from the top of an autoclave.
McKee made the design specifications. CBI fabricated the autoclave in late 1964 and early 1965, and shipped it to Olin. Only CBI's name was affixed to the nameplate as manufacturer.
The autoclave is a cylindrical pressure vessel approximately 6 feet in diameter which stands almost 85 feet high. Several insulated pipes enter and exit the vessel at the top through a header, a large, circular metal flange, 3 feet in diameter and 10 inches thick, which weighs 2,700 pounds. A work platform encircles the top of the autoclave so that the header can be serviced. The header is attached to the autoclave by 16 threaded studs which pass through 3 inch holes equally spaced along the outer circumference of the header. An aluminum gasket is inserted between the header and the autoclave, and a seal is formed when the studs are bolted down with large nuts, marrying the gasket to concentric serrations on the header and autoclave.
After Lopez and his co-workers first removed the large nuts with impact wrenches, their supervisor, Harvey LaFosso, then signaled an 80 ton crane to boom down over the header. Two choker slings with shackles were attached to the crane and hooked to two lifting lugs on the header. When initial attempts to remove the header by use of just the crane failed, Lopez and his co-workers, under orders from their supervisor, positioned brass wedges where the header mated with the top of the autoclave and then beat the wedges with 16 pound sledge hammers as the crane pulled up on the header. After some effort was expended by the men, the seal finally broke. Under the influence of the crane's upward pull, the header was propelled 20 to 30 feet into the air and struck the boom of the crane. Lopez jumped back on the platform as the header was jerked upward. He struck his back and elbow on either a chain fall or come-along left on the work platform by an earlier crew which had removed the insulation from the header. Lopez was treated with heat at the first aid station for bruises on his back and remained on light duty for two weeks.
Ultimately, Lopez underwent a spinal fusion and at the time of trial was still unable to work.
Lopez sued Mike Queenan Equipment Company, Mike Queenan Rigging, Inc., and their insurers, as well as CBI.
Just prior to trial, the trial court denied CBI's motion for summary judgment in which it sought dismissal from the litigation pursuant to the peremption statute, and its motion to file a third-party demand against McKee for contribution or indemnity.
*294 At the close of Lopez's case-in-chief, the Queenan defendants and their insurers were dismissed on motions for directed verdict.

JUDGMENT NOTWITHSTANDING THE VERDICT
CBI contends that the trial court should have denied Lopez's motion for JNOV. It argues that there was conflicting evidence about whether the header design was defective, and that the trial court substituted its evaluation of credibility for the jury's.
Although LSA-C.C.P. Art. 1811 sets forth the rules governing a motion for judgment notwithstanding the verdict, the standard for granting a JNOV has developed jurisprudentially. In Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270 (La.1986), the Supreme Court, quoting from Boeing v. Shipman, 411 F.2d 365 (5th Cir.1969), stated:
"When `the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions [directed verdict and judgment n.o.v.] is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied....'"
The standard for determining the propriety of granting a JNOV is the same as used to determine whether a directed verdict should be granted. Rougeau v. Commercial Union Ins. Co., 432 So.2d 1162 (La.App. 3rd Cir.1983), writ denied, 437 So.2d 1149 (La.1983). In applying this standard the court can not weigh the evidence, pass on the credibility of the witnesses, or substitute its judgment of the facts for that of the jury. Id. at page 1166. Although credibility determinations and evaluation of evidence are reserved to the jury, where virtually no factual dispute exists, no credibility determinations by the jury are required. In such a circumstance, question of existence of a duty, violation of that duty by the defendant, and assumption of the risk or contributory negligence by the plaintiff are legal questions, and certainly within the province of the judge. Id. at page 1166. Simply stated, when there is no factual dispute, the judge is within his province in applying whatever law is applicable.
In reviewing a JNOV we apply the manifest error rule to the judge's conclusions on liability and quantum. Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir. 1985), writ denied, 476 So.2d 353 (La.1985).
The applicable law to the case at hand concerns a design defect in products liability. A product is unreasonably dangerous because of design if a feasible way existed to design the product with less harmful consequences, even though this product was not unreasonably dangerous per se. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). The standard of knowledge, skill, and care in regard to the failure to use alternative products or designs is that of an expert, including the duty to test, inspect, research, and experiment commensurate with the danger. For this purpose, evidence of whether the manufacturer, held to an expert's standard and skill, could know of and feasibly avoid the danger is admissible under a theory of recovery based on alleged alternative designs or alternative products. Id. at 115.
The first issue CBI raises is that it was the fabricator, not the designer of the autoclave; thus, it argues that it cannot be considered as the manufacturer of the header, one of the autoclave's component parts. This is CBI's main defense.
In Chastant v. SBS-Harolyn Park Venture, 510 So.2d 1341 (La.App. 3rd Cir.1987), writ denied, 513 So.2d 825 (La.1987), we stated:
"The actual manufacturer of a product is held to the higher standard of a manufacturer. Additionally qualifying for `manufacturer' status is a vendor who holds out the product as his own. Penn v. Inferno Manufacturing Corp., 199 So.2d 210 (La.App. 1st Cir.1967), cert. *295 den., 251 La. 27, 202 So.2d 649 (La.1967). Holding out a product in any significant manner as one's own is likely to earn one the label `manufacturer.' Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc., 262 La. 80, 262 So.2d 377 (1972); Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978). Furthermore, the manufacturer of the completed product is treated as a manufacturer of the component parts. Spillers v. Montgomery Ward & Co., Inc., 294 So.2d 803, 807 (La.1974). Obviously, `apparent manufacturers' may be held liable in redhibition, when a manufacturer's imputed knowledge of defects is assessed against them."
As explained in Penn, supra, citing Carney v. Sears, Roebuck and Co., 309 F.2d 300 (4th Cir.1962), the basis for this rule is that `"where the vendor puts only its name upon the product without indicating that it is actually the product of another then the public is induced by its reasonable belief that it is the product of the vendor to rely upon the skill of the vendor and not upon the skill of any other."'
This issue was squarely addressed in Bacile v. Parish of Jefferson, 411 So.2d 1088 (La.App. 4th Cir.1981), writ denied, 415 So.2d 950 (La.1982), and disposed adverse to CBI's contention. There, our brethren of the Fourth Circuit disposed of the defendant's argument that a fabricator was not a manufacturer, saying:
"The manufacturer is also liable to plaintiff for its failure to manufacture the grate in a reasonably safe condition for its intended use. That the manufacturer fabricated the grate in accordance with the parish's design and specifications would not exculpate the manufacturer towards a person injured in normal use of the thing; a manufacturer who knows the intended use cannot join in creating an unreasonable risk of injury by manufacturing a thing that presents such a risk in its intended use ... Insofar as plaintiff is concerned, those questions are immaterial because the parish's liability exists under C.C. 2317 whether or not its design was the cause of the defect, and the manufacturer's liability also exists irrespective of whether it merely followed an unreasonably dangerous design or on its own created, by departing from the design, an unreasonably dangerous product. Insofar as defendants are concerned between themselves it might arguably make a difference if the design or manufacturing defect were not so evident that either party should have noted the other's error; but neither establishes that the injury was attributable exclusively to the other, and thus each is entitled not to indemnity from the other but only to contribution of half; Hunt v. City Stores, 387 So.2d 585 (La.1980)."
In the case sub judice, CBI's nameplate, the only label affixed to the autoclave, listed it as manufacturer. Furthermore, Nicholas Bassar, a CBI engineer of many years and the engineer in charge of the fabrication of this autoclave, was listed on numerous drawings as the design engineer. CBI is designated as the manufacturer of the autoclave in the manufacturer's report submitted for the required safety tests conducted.
On these facts, we find no error in the trial court's treatment of CBI as the manufacturer of the autoclave, and its evidentiary ruling which excluded detailed testimony that McKee was the manufacturer. In accord see LSA-R.S. 9:2800.53(1) and (1)(a) which, though not applicable retroactively, are nonetheless supportive of this conclusion.
Now, we turn to the trial court's decision to grant Lopez's motion for JNOV, and CBI's argument that a stream of conflicting evidence was unrolled about whether a safer, feasible alternative design existed in 1965.
Lopez testified that turnaround work was done on the autoclave approximately every other year, and that since the autoclave had been installed, Olin's workers had difficulty removing the header from the autoclave because of the gasket sticking.
George Greene, Lopez's expert engineer, testified that the sticking problem at the header should have been anticipated because *296 of CBI's use of the soft aluminum gaskets, through which concentric serrations, cut into the header and cover, insured a secure fit between them, and its additional use of long studs through the header which had a tendency to bind the header as it was raised. In light of these problems, Greene concluded that there was a simple, alternate design which would alleviate, if not eliminate, the problems. He constructed a model using jackscrews to break the sealed gasket and simultaneously lift the header to avoid binding at the studs. Greene stated:
"Jackscrews are used on all types of equipment, sir. You know, it's used for levelling [sic] equipment; it's used for uncoupling flanges, such as this [the header/cover of the autoclave]. You know, it's used where you have a press fit on a gasket situation, you know, where you have to uncouple a flange from a gasket. You know, this technique, you know, has been around a hundred years, I guess."
Lopez testified that jacks or jackscrews were used in Olin's plant on other equipment to loosen flanges and for leveling. It was Greene's testimony that such a design would have increased the cost of the product by approximately $100.
CBI's expert testimony was short and conclusionary. Mr. Bassar testified that he had never before seen a jackscrew arrangement such as the one Greene presented as an alternative design. CBI presented no evidence to refute Greene's testimony that jackscrews had been utilized in this manner in the industry for a long period of time. It did not dispute either the feasibility or workability of Greene's design.
As we draw our conclusion, we are cognizant of CBI's contention that there was a body of testimony which refuted Greene's statement that the use of his alternative design would have prevented gasket damage if wedges, such as the ones employed by Lopez and his co-workers, were used to break the seal. It is this variance in testimony between the two experts that CBI contends created a conflict, therefore, the JNOV was improperly granted. We have reviewed the extensive cross-examination of Greene concerning gasket damage and do not find that he completely adhered to his statement that gasket damage would not occur. Notwithstanding this, assuming there was conflict between the two experts over gasket damage, this variance between the experts is inconsequential because gasket damage was not the issue. The issue was the gasket sticking. CBI even gave Olin extra gaskets for replacement of damaged gaskets when CBI delivered the vessel. Therefore, the variance in testimony between the two experts concerning damage to the gasket is not sufficient to defeat the JNOV. On the issue of sticking, Mr. Bassar, CBI's expert, ultimately concluded:
"I didn't know whether it would stick or not [when it left CBI's facility in Chicago]. But when I found out that it did stick, in looking at the drawings, I could see where it would stick."
There is no dispute that the 2,700 pound header sticking when removing it from atop the 85 feet autoclave was the problem. The defect in design was a failure to provide a design for the removal of the header under these conditions.
Contrary to defendant's contention the record is void of conflicting testimony between plaintiff's expert, Greene, and defendant's expert, Bassar. In the nineteen pages of Bassar's testimony, he did not refute Greene's alternative design. Bassar simply stated he had never seen a design like the one Greene proposed. We do not consider this statement in conflict with Greene's testimony. The defendants offered no testimony or evidence to show that plaintiff's alternative design would not work, that it was impossible, or even suggest that it was not available when the autoclave was manufactured. The record shows that plaintiff's alternative design stands unrefuted.
It is apparent the jury did not fully appreciate the law of products liability with these uncontested facts. By finding Olin 100% at fault, it is also apparent the jury got sidetracked by CBI's defense that Olin was responsible for Lopez's injuries since *297 Olin's supervision insisted the workers remove the header in spite of the great difficulty the men were having because of the sticking problem.
Thus, we find, as did the trial court, that based on a close reading of the record, reasonable men could not have concluded other than that an alternative design for the autoclave existed which was capable of preventing the damage encountered herein, and that there existed a likelihood that the product's design would cause the damage Lopez encountered. Therefore, the trial court properly granted plaintiff's motion for JNOV.

LIABILITY
It is obvious that CBI failed to make any design for the removal of the header for cleaning the autoclave, which had to be done approximately every two years. In removing the header, three obstacles had to be overcome: weightthe 2,700 pound header; height85 feet high; and, the header sticking to the autoclave. When Bassar, who was in charge of manufacturing the autoclave for CBI, was asked on direct examination about the removal of the header, he responded:
"Well, ordinarily, when a flange like that is stuck or something, you take some wedges and you pound it in until it breaks the seal; and then if it's heavy enough, you attach a crane to it and carry it off. Well, in this case, the cover [header] weighing 2,670 odd pounds. Just pounding the wedges underneath, it would appear that you couldn't tell when you had a break. So you would attach the crane to it and give it a slight pull. Now, it's difficult to gauge how much pull you're going to have on there. For safety reasons you could leave three or four nuts loosened, and remove the remainder, and then pound along the side until it would break; and when it broke, you would get that sudden uplift; then, you could remove those three and lift the cover [header] up."
However, in cross-examination it is shown that Bassar erroneously assumed that the design of the autoclave did not have to include a design for the removal of the header:
"Q. I thought, Mr. Bassar, when you testified as the first witness, sir, that you said that whether the vessel stuck or not was not your concern when you were up there in Chicago.
A. I could say that it wasn't. But there is a means of unsticking it. But it is not our problem to do the unsticking.
* * * * * *
A. No, I don't recall ever saying that we would write them instructions about taking it off. We told them how to put the cover [header] on in order for it to be sealed. And then as far as taking it off is concerned, the normal practice in the construction field is to take wedges and break the seal and then lift the cover [header] off; and I didn't presume to tell Olin Mathieson Chemical Company Maintenance Department how to unbutton [remove the header from the autoclave] the vessel."
This erroneous conclusion led to the design of a defective product. Because of this defect, it made the removal of the header an extremely dangerous process. A design that presents unreasonable hazards within range of the equipment's foreseeable uses imposes an additional duty on the designer-manufacturer to provide adequate guards against those hazards. Lanclos v. Rockwell Intern. Corp., 470 So.2d 924 (La. App. 3rd Cir.1985), writ denied, 477 So.2d 87 (La.1985).
In casting CBI with liability, the trial court made the following conclusions:
"Plaintiff's expert witness, Geoge Green [sic], presented a working model of the product using jackscrews. CBI's expert, Nicholas Basser, Jr., [sic] who also was the one in charge of the manufacturing of the vessel, did not dispute the feasibility or workability of this design or his prior knowledge of this procedure. In explanation of his failure to provide *298 for the use of jackscrews, he stated that he never addressed the issue of the danger involved in removing the header, that he knew the header might stick, that he knew the header would have to be removed periodically, but that it was not his concern if it ever stuck or not. He attempted to justify this lack of concern by explaining that he simply manufactured the product pursuant to a purchase order and design furnished by Arthur G. McKee & Company.
CBI is clearly at fault in another respect. In addition to his above referred to knowledge, Basser [sic] acknowledged that the method used by Olin to remove the header was dangerous and could cause harm. Yet, he failed to send out instructions with the product or to warn of the inherent dangers in the product. This expert also suggested another method that Olin could have used to remove the header that would have been safer than the method actually used. Yet, the company provided no warning or instruction booklet telling how the header could be safely removed. He erroneously assumed that his company's responsibility as a manufacturer did not extend to this area. He had absolutely no concern for the safety of the product in its normal use."
We find the trial court's conclusions well supported by the record, therefore, it did not commit manifest error. Further, we find the record supports that CBI, held to an expert's standard and skill, could have known of and feasibly avoided the danger inherent in its design of the autoclave.
CBI further urges that Lopez's injury was not the result of a defective product, but rather due to Lopez falling over a tool left on the platform by another crew. While we find CBI's argument respectable it fails for want of causation. But for the defect in design, there would have been no fall. The fall was a direct result of Lopez jumping out of the way of the 2,700 pound header swaying in the air from the boom. It is not necessary that the defect in design be the sole factor in causing Lopez's injury in order for CBI to be liable. CBI's substandard conduct is actionable if it is a substantial factor in Lopez's injury without which his injury would not have occurred. Winterrowd v. Travelers Indem. Co., 452 So.2d 269 (La.App. 2nd Cir.1984), affirmed, 462 So.2d 639 (La.1985).

PEREMPTION
CBI contends that the trial court erred in failing to grant its motion for summary judgment which was premised on its non-liability because of the peremptive effect of LSA-R.S. 9:2772.
LSA-R.S. 9:2772 provides, in pertinent part:
"A. No action, whether ex contractu, ex delicto, or otherwise, to recover on a contract or to recover damages shall be brought against any person performing or furnishing land surveying services, as such term is defined in the first paragraph of R.S. 37:682(9), including but not limited to those services preparatory to construction, or against any person performing or furnishing the design, planning, supervision, inspection, or observation of construction or the construction of an improvement to immovable property:...."
From the plain wording of the statute, it is clear that the threshold issue in the determination of the applicability of LSA-R.S. 9:2772 is whether the autoclave manufactured by CBI constituted an improvement to immovable property as required in paragraph A.
Tracts of land, with their component parts, are immovables. LSA-C.C. Art. 462. Buildings and other constructions permanently attached to the ground are component parts of a tract of land when they belong to the owner of the ground. LSA-C.C. Art. 463.
In P.H.A.C. Services v. Seaways Intern. 403 So.2d 1199 (La.1981), the Supreme Court commented:
"Constructions other than buildings are now classified as movables unless they are component parts of a tract of land. To be a component part of a tract of *299 land, a construction must meet two requirements: it must be permanently attached to the ground, and it must belong to the owner of the ground."
The jurisprudence is replete with reference to the holding that the moving party on a motion for summary judgment, the procedural vehicle utilized by CBI in this matter, must establish that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.
In the present case, we have combed the record and fail to find any proof that Olin, the owner of the autoclave, is also the owner of the land on which the autoclave is situated. CBI's statement in brief that one can infer Olin's ownership of the land because it contracted with McKee to build an ammonia plant at its facility, is insufficient to establish Olin's legal ownership of the land. Thus, in the absence of evidence of that fact, the autoclave remains a movable construction under LSA-C.C. Art. 463 and the provisions of LSA-R.S. 9:2772 are inapplicable. See also Comment (d) to LSA-C.C. Art. 464.
Therefore, we need not address CBI's contention about the applicability of LSA-R.S. 9:2772.

QUANTUM
CBI contends that Lopez failed to prove that the accident involving the autoclave caused his back injury. In the alternative, CBI contends the trial court's award of $200,000 for pain and suffering was excessive. CBI does not attack the remainder of the award.
The plaintiff has the burden of proving his injuries and a causal connection between the injuries and the tort by a preponderance of the evidence. McGrew v. Jordan, 516 So.2d 1246 (La.App. 2nd Cir. 1987). When the defendant's tortious act aggravates a pre-existing condition or injury, the victim is entitled to compensation for the full extent of the aggravation. Perniciaro v. Brinch, 384 So.2d 392 (La. 1980).
CBI first argues that Lopez injured his back almost a year prior to his August 8, 1984, accident involving the removal of the autoclave header, and it should not be liable for Lopez's back injury.
Lopez testified that approximately one year prior to his August 8, 1984, accident at Olin, he injured his back while lifting railroad ties. He was treated at the company clinic, never saw a doctor, and did not miss work because of that injury.
At the time of his fall on the platform around the urea autoclave, he struck his back on equipment in his attempt to get out the way of the header. He had immediate back pain and had to be assisted down the 85 feet of stairs.
Lopez worked light duty for the first two weeks after the accident and finally sought medical attention from Dr. Savoie, his family physician, because of continued pain in the back. Dr. Savoie examined Lopez and immediately referred him to Dr. R. Dale Bernauer, an orthopedic specialist, who examined him on August 29, 1984.
At that initial visit, Lopez complained to Dr. Bernauer of neck pain and back pain radiating down the left leg. A straight leg raising test was positive on the left side which was indicative of sciatic nerve irritation. Subsequently, cat scans, a myelogram, and a diskogram showed that Lopez had a posterior herniation of the disk at L4-5 and L5-S1.
On September 11, 1984, Dr. Bernauer injected the disk with an enzyme, a process referred to as chemonecleolysis, but because Lopez's back pain continued, a repeat myelogram was done in anticipation of back surgery. Ultimately, Dr. Bernauer performed a posterior lumbar interbody fusion at the L4-5, L5-S1 levels. Although Lopez's pain initially decreased after surgery, x-rays taken in March of 1985 showed that the disk at the L3-4 level, just above the area repaired surgically, had collapsed from the added stress caused by the fusion surgery.
Dr. Bernauer, as of the time of trial, continued to treat Lopez. He indicated that Lopez continued to suffer pain in the back and was required to use a medium *300 strength pain medication. Dr. Bernauer opined that the accident of August 8, 1984, was a contributing factor or a cause of Lopez's disk problem, and that Lopez would not be able to perform manual labor in the future.
In examining the testimony of Lopez and the medical testimony of Dr. Bernauer, we cannot say that the trial court erred in finding that Lopez proved by a preponderance of the evidence that the August 8, 1984, accident was the cause of his back problems. He had not missed work because of the earlier back injury. More convincingly, before the accident, there was no medical evidence that he suffered pain radiating down into the left leg, a complaint made to Dr. Bernauer at his first visit which was indicative of nerve irritation.
CBI next contends that the $200,000 award for pain and suffering is excessive.
In making this award for pain and suffering, Judge Hood, in thorough, well written reasons for judgment, stated:
"Plaintiff was thirty years old at the time of the accident. He had quit school in the ninth grade. At the time of the accident, he was working as a boilermaker with permanent employment. Despite his limited education, he was making in excess of $30,000.00 per year at the time of the injury and had been doing so for the past several years. He had an excellent work history. All of his work had consisted of heavy manual labor. He is a large man, obviously possessing great strength.
Among his injuries were a herniated disc between the 4th and 5th lumbar vertebrae and a herniated disc between the 5th lumbar vertebrae and the sacrum. He had two surgeries, the first a chemonecleolysis, consisting of the injection of the disc with an enzyme designed to shrink the disc down and get rid of the herniation. That procedure was unsuccessful, and the second surgery consisted of two posterior lumbar interbody fusions, one at both levels. The two discs were removed.
He is permanently disabled from doing any manual labor. His orthopedic surgeon testified that he would restrict him to not lifting a weight greater than twenty-five pounds, and not standing for longer than three to four hours without a rest period, sitting likewise. He can do no jobs that entail walking for any distances and no jobs entailing stooping, crawling or climbing. He can only do sedentary type work, sitting most of the time, with some walking in it.
Solid fusions were not obtained. Consequently, he has some spinal instability which causes and will continue to cause pain. Additional surgery is not recommended because in the doctor's opinion it would hurt rather than help him. He has continuing nerve irritation, which the doctor does not think will improve. If the pain gets bad enough, another myelogram and another fusion might be appropriate.
He has considerable pain in his neck which the doctor considers to be a chronic strain type problem.
According to his doctor, he will always have pain in his back, probably on an intermittent basis. The pain will be worse when he exerts himself and better when he rests. He has been on pain medication continuously and may require pain medication for the rest of his life."
As an appellate court we may not disturb an award of general damages made at the trial court level without a finding of clear abuse of discretion and then only after abuse is shown through an articulated analysis and for articulated reasons. Reck v. Stevens, 373 So.2d 498 (La.1979).
After carefully reviewing the record of this matter, we cannot say that the trial court abused its discretion in making this award for pain and suffering.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of these proceedings are assessed to CBI.
AFFIRMED.
STOKER, J., dissents and assigns written reasons.
*301 STOKER, Judge, dissenting.
With respect I dissent. With all due deference to the trial judge in this case, it is clear to me that he erred in several fundamental respects. The trial judge did not apply the proper standard for granting a judgment notwithstanding the verdict, misunderstood and misapplied the law relating to the liability of contractors who undertake to make or fabricate constructions specially designed by others, and improperly denied Chicago Bridge and Iron Company the right to present evidence to the effect that it was not the designer of the autoclave purchased by Olin.
In view of the fact that the jury exonerated Chicago Bridge and Iron Company (Chicago), it might seem that the sole question here is whether reasonable minds could not have made that decision. I definitely think the jury was justified in making that decision. Furthermore, I am inclined to agree with the jury. However, I think it is appropriate to address all the errors committed by the trial judge because they obviously influenced his conclusion that the jury was wrong. Since the majority agrees with the trial judge, I feel compelled to address all questions. I find it difficult to segregate the issues, but will try to do so and discuss them individually.
In summary my views are as follows:
1. The jury answered "No" to interrogatory No. 2, which interrogatory asked whether the header of the autoclave was defective in design. From the evidence and expert testimony, reasonable minds could make that conclusion.
2. Even if there was a defect in the design of the autoclave, Chicago was not responsible for the design. It did not, as a matter of fact, design the autoclave.
3. The trial judge erroneously concluded as a matter of law that because the autoclave bore Chicago's manufacturer's label, it was conclusively deemed to be the designer of the structure or was at least responsible without further inquiry. Therefore, the trial judge committed error during the trial in refusing to permit Chicago to present evidence to the jury that Arthur G. McKee & Company was the designer.
4. The trial judge erred in basing any inferences that Chicago owed any duty, with reference to the design (assuming it was defective), or owed any warning upon the erroneous concept that Chicago must be cast in the role of designer of the autoclave because it bore Chicago's label.

DID THE TRIAL COURT APPLY THE PROPER STANDARD IN GRANTING THE JNOV?
The jury in this case answered "No" to the following question: "Was the header of the autoclave defective in design, and if so, was such defective design a legal cause of plaintiff's injuries?" This case may not be a product liability case in the usual sense; but with reference to product liability cases in the strict sense it has been held that whether a product is defective because of its design is factual and depends on the circumstances of each case. LeBleu v. Homelite Div. of Textron, Inc., 509 So.2d 563 (La.App. 3d Cir.1987) and Thompson v. Tuggle, 486 So.2d 144 (La.App. 3d Cir.), writ. denied, 489 So.2d 919 (La.1986).
In making this factual determination, the jury had the testimony of two experts, the plaintiff's, Mr. George Greene, and defendant's, Mr. Nicholas Bassar. In a fair-minded resolution of this testimony reasonable jurors could have concluded that the problem was not in the design of the autoclave or its header. Rather the problem could have been in the lack of skill and care exercised by the Olin workers, principally the supervisory personnel. The autoclave did not explode and blow the header off the body of the autoclave. It was jerked off. The problem involved here was how to remove the stuck head without causing an untoward incident. (As I understand the facts, the plaintiff was not struck by the header, rather plaintiff jumped back to avoid the header as it was jerked off and injured himself when he fell against the surrounding structure.)
The alleged risk associated with the autoclave and its header involved technique. Plaintiff made complaint regarding the *302 technique being employed. Obviously the danger or risk he saw meant that neither he nor anyone else needed a warning as to technique. Mr. Bassar testified that in order to avoid the danger of mishap associated with a sudden loosening of the header and abrupt jerking of the header away from the main structure, some of the nuts should be only partially unscrewed from the bolts running through the header. It seems to me that Mr. Bassar was correct in expecting that trained maintenance crews would do this. The analogy may be rough, but I conceive of this technique as being similar to the procedure followed by prudent persons in removing a tire or wheel from an automobile. With the automobile jacked up to lift the wheel off of the ground or other surface, the person seeking to remove the wheel does not remove all the lug nuts as they are reached. All, or at least some, of the nuts are loosened, but left engaged with the shaft threading. In this manner, if the jack suddenly shifts or fails, the wheel will not abruptly fall off.
Plaintiff's expert, Mr. Greene, showed the jury a model in which he used jack screws affixed to the header. Mr. Greene suggested that use of the jack screws to remove the header from the autoclave would eliminate the use of a crane or cherry picker. Possibly this is a better mousetrap. However, it does not prove, as the trial judge held, that the autoclave was unreasonably dangerous because of design. Assuming that use of jack screws would be workable, this does not mean the jury could not reasonably conclude that the method suggested by Mr. Bassar would provide an appropriate method of avoiding any danger from abrupt separation of the header from the main body of the autoclave.
In my opinion, reasonable men could have concluded that the mishap which befell plaintiff resulted from lack of expertise or care on the part of Olin employees in removing the header and not from a defect in design.
In his reasons for judgment the trial court made the following statement:
"A product is unreasonably dangerous because of design if a feasible way existed to design the product with less harmful consequences, even though the product was not unreasonably dangerous per se."
The trial court cited the case of Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986) in support of this proposition. I am not sure that this does not overstate Halphen. In any event, the rule should not mean that any better mousetrap devised will trigger application of the rule. It does not allow for alternative mousetraps. The jury in this case was presented with the testimony of two experts. Each proposed a solution for safe removal of the header. As noted above, whether a product is defective because of its design is factual and depends on the circumstances of each case. LeBleu v. Homelite Division of Textron, Inc., supra. Determination of defectiveness is therefore a jury question. If there was any "dispute" between experts it was within the province of the jury to resolve it, not the trial judge's. As was said in Rougeau v. Commercial Union Ins. Co., 432 So.2d 1162 (La.App. 3d Cir.), writ. denied, 437 So.2d 1149 (La.1983): "In applying this standard [for JNOV] the court can not weigh the evidence, pass on the credibility of witnesses, or substitute its judgment of the facts for that of the jury."
Before leaving the issue of design defect I make the following comment regarding design defect insofar as it related to failure to warn. The necessity of following proper procedure or technique in removing the header should have been obvious to the Olin people. The jury could have concluded that Olin did not need any warning, as is shown by the objections voiced by the plaintiff and others. The jury could have concluded that the cause of the accident in this case was not lack of warning, but the obstinacy of Olin's people in persisting in going about the job in their own way despite the possibility of abrupt separation of the header from the autoclave.
In my view, presented with the evidence heard by the jury in this case, reasonable minds would be fully justified in reaching the conclusion that the jury reached. The *303 facts and inferences did not so strongly and overwhelmingly point in favor of one party (plaintiff's expert) that the trial court could believe that reasonable jurors could not arrive at a contrary verdict. Factual questions were answered by the jury, and the trial court simply substituted its views in place of the jury's views.
The majority opinion properly states the rule for, and standard to be applied in, considering whether a trial court should cast aside a jury finding of fact and grant a judgment contrary to the jury's. I think it is appropriate to repeat here that portion of the majority's opinion:
"Although LSA-C.C.P. Art. 1811 sets forth the rules governing a motion for judgment notwithstanding the verdict, the standard for granting a JNOV has developed jurisprudentially. In Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270 (La.1986), the Supreme Court, quoting from Boeing v. Shipman, 411 F.2d 365 (5th Cir.1969), stated:
"`When "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions [directed verdict and judgment n.o.v.] is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied...."'
"The standard for determining the propriety of granting a JNOV is the same as used to determine whether a directed verdict should be granted. Rougeau v. Commercial Union Ins. Co., 432 So.2d 1162 (La.App. 3rd Cir.1983), writ denied, 437 So.2d 1149 (La.1983). In applying this standard the court can not weigh the evidence, pass on the credibility of the witnesses, or substitute its judgment of the facts for that of the jury. Id. at page 1166. Although credibility determinations and evaluation of evidence are reserved to the jury, where virtually no factual dispute exists, no credibility determinations by the jury are required. In such a circumstance, question of existence of a duty, violation of that duty by the defendant, and assumption of the risk or contributory negligence by the plaintiff are legal questions, and certainly within the province of the jury. Id. at page 1166. Simply stated, when there is no factual dispute, the judge is within his province in applying whatever law is applicable."
I agree with the above statement but have reservations concerning a statement in the opinion which follows. The statement reads:
"In reviewing a JNOV we apply the manifest error rule to the judge's conclusions on liability and quantum. Robertson v. Penn, 472 So.2d 927, (La.App. 1st Cir.1985), writ denied, 476 So.2d 353 (La. 1985)."
I am not sure that this is correct. I acknowledge that courts have used the words manifest error in this context, but it seems unnecessary and is apt to be misleading. The standard for granting a JNOV has been stated clearly by numerous courts and particularly by Justice Watson in the Louisiana Supreme Court case of Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270 (La.1986). All that an appellate court need do is to examine the record and determine whether the trial judge properly applied the standard for granting a JNOV. To talk in terms of manifest error does not advance the process of analysis.
If thinking in terms of manifest error is directed toward the jury verdict, then it is not likely that error on appellate review will result. On the other hand, if manifest error analysis is applied only to the trial judge's conclusions, ignoring the jury verdict, then it will almost certainly result that the JNOV standard will not be applied. This is so because, by testing the judge's conclusions only, an appellate court will test the matter as if the case had been a bench trial; that is, the question will be whether the trial court was clearly wrong about its own view of the facts, not whether the jury could have reached the conclusions *304 that it did. Such a cognitive process will almost certainly result in allowing trial judges to simply substitute their views of the facts for that of the jury. A trial judge may not apply the preponderance of evidence rule in granting a JNOV. Scott v. Hosp. Serv. Dist. No. 1, supra, and Robertson v. Penn., supra. Cf. Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir.1979), appeal after remand, 412 So.2d 191 (La. App. 3rd Cir.1982), writ denied, 415 So.2d 954 (La.1982).

TO WHAT EXTENT WAS THE FABRICATOR RESPONSIBLE FOR THE DESIGN?
From my point of view, the question of Chicago's responsibility for the design of the autoclave should never be reached because, as the jury concluded, there was no design defect. However, because the trial judge and the majority opinion dwells so much on this question I feel bound to put my own views on record. I disagree with the trial judge's views and those of the majority.
It seems to me that there is no dispute in this case but that the designer of the autoclave was McKee. McKee occupied a middle position. It sold to Olin and contracted with Chicago to fabricate the autoclave according to design plans and specifications worked up by McKee.
The correct statement of the law governing such situations was stated by Chief Justice Dixon (on rehearing) in Brown v. White, 430 So.2d 16 (La.1982). Through Chief Justice Dixon the court said:
"The jury found that The National Drying Machinery Company was negligent in manufacturing the drying system, but that this negligence was not a proximate cause of Brown's injury. This finding was not correct, but the result is the same. The record reveals that du-Pont submitted to The National Drying Machinery Company the design specifications for the drying system, and that National merely transferred these designs according to its production scale to its own blueprints. A manufacturer cannot be held negligent when it has no part in the design of a system, when it is the system design which presents dangerous risks to the employees, unless the danger is or should be apparent to the manufacturer. C.C. 2315. Therefore, the finding that The National Drying Machinery Company was negligent is reversed."
See also Cutchall v. Great American Pump Co., 460 So.2d 1106 (La.App. 2d Cir. 1984).
Under these cases, where there is a design defect, the question is whether the danger is or should be apparent to the manufacturer. Since the jury found that the autoclave in this case had no design defect, I do not regard this rule as coming into play. As noted above, the problem could have arisen out of the manner in which the Olin crew went about the job. Chicago had a right to expect that the user, Olin, would go about servicing its apparatus in a proper manner so as to avoid risk of abrupt separation.
The correct rule, as I see it, is that stated by Chief Justice Dixon in Brown v. White, supra. That is not the same rule applied to mass producers of standardized products marketed by merchandisers throughout the land to the public at large. Nor is it the rule applied to professional vendors who adopt and label as their own a product designed and manufactured by a producer who sells large numbers of the product to numerous distributors. Typical of this situation is the hammer in Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978), which was manufactured by Vaughan and Bushnell but was sold by Sears as its own under its "Craftsman" label.
In this case it appears to me that the labeling rule was misapplied by the trial judge. In a sense, the rule was turned around backward. The label was affixed by the actual fabricator, Chicago. Chicago was required to label the autoclave and does not deny it fabricated or manufactured the autoclave. The trial judge's insistence on making something out of the labeling issue does not serve to properly analyze the legal relations in this case, nor does it aid in determining the proper governing *305 legal principles. The matter of the labeling is simply not pertinent to this case.
In my opinion the rule of Brown v. White was properly applied in Bacile v. Parish of Jefferson, 411 So.2d 1088 (La. App. 4th Cir.1981). That case is cited by the majority opinion in this case as supporting the JNOV. However, the drain grate in that case had an obvious design defect because the foot of an 11-year-old child would go through the end space in the grate. Although the grate was manufactured according to design and specifications furnished by Jefferson Parish, the purchaser and user, the manufacturer should have been aware of the danger posed by the width of the grate space. Therefore, I see a distinction between the Bacile case and the case before us. The grate in Bacile caused injury through normal use. The situation in this case arose through improper use (procedures and techniques) by the user, Olin.
For the foregoing reasons, I feel that application to this case of traditional manufacturer's or products liability legal principles, including the effects of labeling of products, presents false issues. The proper legal principle to be applied was that stated in Brown v. White. Injection of false issues in the case unwittingly misled the trial judge and majority in this case. Although I disagree, the trial judge and the majority in this appeal might have properly reached their result by application of Brown v. White to the facts. As it stands, however, I wish to go on record as not being bound by the analysis made by the majority in this case.

WAS IT PROPER TO EXCLUDE EVIDENCE AS TO WHO DESIGNED THE AUTOCLAVE?
Chicago was not allowed to present evidence to the jury to show that McKee, not Chicago, designed the autoclave and that Chicago merely fabricated the autoclave according to the design plans submitted to it. Inasmuch as the jury in this case found Olin to be at fault, and found Chicago not to be at fault, this issue is perhaps not significant. Moreover, the record contains the proffered evidence on this point introduced by Chicago. In view of what I have said above, it is my opinion that the evidence should have been permitted as regular evidence to be heard by the jury.

PRESCRIPTION OR PEREMPTION ISSUE
As to the prescription or peremption issue involving LSA-R.S. 9:2772, I agree with the majority opinion for the sole reason that, as a technical matter, there is no evidence in the record that Olin owns the land upon which the autoclave is situated.

CONCLUSION
For the reasons stated above, I believe that the trial court incorrectly applied the standard for JNOV. In light of all of the evidence in the record before us, and considering all reasonable inferences in favor of Chicago, I cannot conclude that the facts and inferences point so strongly and overwhelmingly in favor of plaintiff such that reasonable men could not have arrived at a verdict in favor of Chicago. At the very least it must be said that the evidence before us is such that reasonable and fair-minded men in the exercise of impartial judgment might have reached different conclusions. For this reason, I regard as error the trial court's substitution of its evaluation of the facts for that of the jury and would hold that this is not an appropriate situation for the granting of a JNOV. I would reverse the trial judge's granting of the JNOV and render judgment in accordance with the jury verdict. Therefore, I respectfully dissent from the majority opinion.